CHRISTOPHER BROUSSARD
17601 Interstate 35 South
Lytle, Texas 78052
832-538-6370

Pro Se

FILED

DEC 1 5 2021

CLERK, U.S. DISTRICT COURT
WESTERN DISTRICT OF TEXAS
BY_____
DEPUTY CLERK

# IN THE UNITED STATES DISTRICT COURT

## WESTERN DISTRICT OF TEXAS

### SAN ANTONIO DIVISION

CHRISTOPHER BROUSSARD,

   Plaintiff,

v.

FINWISE BANK, INC., a State of Utah
Corporation, MULLIGAN FUNDING, LLC, a
Delaware Limited Liability Company,
MULLIGAN SENIOR, LLC, a Delaware
Limited Liability Company, INNOVATIVE
FUNDING SOLUTIONS, LLC, a Delaware
Limited Liability Company, MARK
LEIBOWITZ, an individual, DAVID
LEIBOWITZ, an individual, ZACHARY
STOLL, an individual,

   Defendants.

Case No. SA21CA1238
OG

COMPLAINT FOR:

1. FRAUD;
2. USURY;
3. UNCONSCIONABLITIY;
4. NEGLIGENCE PER SE –
   VIOLATION OF TEXAS
   FINANCE CODE;
5. UNJUST ENRIGHMENT/
   DISGORGEMENT;
6. INJUNCTION AND
   DECLARATORY RELIEF

**DEMAND FOR JURY TRIAL**

## I. INTRODUCTION

**1.** Plaintiff brings this action against Defendant FINWISE BANK, INC., MULLIGAN FUNDING, LLC, MULLIGAN SENIOR, LLC, DAVID LEIBOWITZ, MARK EIBOWITZ and ZACHARY STOLL, based upon the claim that Defendants charged a criminally usurious loan in excess of twice the maximum legal rate of interest in Texas, and also seek to

1   evaded the statutory and regulatory requirements of the Texas Finance Code §§ 302.001(c),

2   305.001, (the "Code"), thereby violating Texas public policy.

3      **2.**      While it may be uncommon to find acts of gross negligence, maliciousness and

4   even malfeasance in the finance industry, however, on occasion, you bump into unmitigated acts

5   of financial war on vulnerable consumers.  Defendants have engaged in an unethical, unlawful

6   and extreme form of predatory *lending practice* seeking to confiscate from Plaintiff a "nose

7   bleeding" 70.4% interest rate on a business loan of $155,000 – that is compressed down into a

8   280 day period.  This kind of "mob boss" style, extraction of 70.4% interest is so palpably

9   obscene and indecent, the picture only lacks the image of an "enforcer" doing a "knee-cap" job

10  on non-paying victims. (See Exhibit 1, breakdown of loan charges, attached hereto).

11     **3.**      Plaintiff hereby alleges under verification as follows.

12                    **II.   JURISDICTION AND VENUE**

13     **4.**      This Court has diversity jurisdiction because there is complete diversity of

14  citizenship between the Parties and the amount in controversy is greater than $75,000.00.

15  Plaintiff is an individual with residency in Bexar County, Texas.  Defendant is a corporation

16  created in the State of Utah and a resident of the State of Utah. Therefore, pursuant to 28 U.S.C.

17  § 1441(b)(1) this Court has Diversity Jurisdiction.

18     **5.**      Venue is proper pursuant to 28 U.S.C. § 1391 for the following reasons: (i)

19  Plaintiff resides within the judicial district of this court; (ii) the conduct complained of herein

20  occurred within this judicial district and all of the property that is the subject of the actions is

21  situated in this district.

22     **6.**      Plaintiff alleges that he entered into two financing agreements with Defendants

23  that required Plaintiff to pay a criminally usurious interest rate that is, in aggregate, the amount

24  of 70.41%.  Said sums are in excess of the jurisdictional limit of $75,000, and which, taken

25  together with general damages, special damages and requested treble and punitive damages is far

26  in excess of the jurisdictional amount in controversy.  Plaintiff seeks to invalidate the full value

27  of all agreements with Defendants and for Defendants to pay back all amounts previously paid in

28  connection thereto, plus penalties and interest thereon.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

### III.  PARTIES

**7.**     Plaintiff CHRISTOPHER BROUSSARD, ("Broussard") is an individual and resident of Bexar County, State of Texas.   Plaintiff is a businessman and is the majority shareholder of a Texas corporation named Apex Services Group, LLC, located at 17601 Interstate 35 South, Lytle, Texas  78052.  The corporation was formed on or about July 31, 2019. Plaintiff deals storage tank restoration services.

**8.**     Defendant FINWISE BANK, ("Finwise") is a State of Utah Corporation, and registered with State of Utah Corporation Number: 1450029-014.   Finwise' headquarters is located at 756 WINCHESTER, 1ST FLOOR MURRAY, UT 84107.   Finwise Bank is a full service bank and engages in small business lending.

**9.**     Defendant MULLIGAN FUNDING, LLC, ("MULLIGAN"), is a State of Deleware, limited liability company, incorporated in 2008 and registered under Delaware Secretary of State file number: 4614316.  Defendant MULLIGAN has a principal office location at: 4715 Viewridge Avenue, Suite 100, San Diego, CA, 92123. David Leibowitz is identified as the CEO of MULLIGAN FUNDING, LLC.

**10.**     Defendant MULLIGAN SENIOR, LLC, ("SENIOR"), is a State of Delaware, limited liability company and is registered with the Delaware Secretary of State.  Defendant MULLIGAN SENIOR, LLC is an affiliate of Defendant MULLIGAN FUNDING, LLC, and manages its funds and has a principal office location at: 4715 Viewridge Avenue, Suite 100, San Diego, CA, 92123.  Defendant MULLIGAN SENIOR, LLC is filed with the Texas Secretary of State under registration number 202130510285.  David Leibowitz is identified as the authorized party to sign on behalf of MULLIGAN SENIOR, LLC.

**11.**     Defendant MARK LEIBOWITZ is an individual and managing member and owner of the majority interest of MULLIGAN FUNDING, LLC, ("MULLIGAN"), and MULLIGAN SENIOR, LLC, ("SENIOR") and is responsible for the conduct of both legal entities. MARK LEIBOWITZ business address is 4715 Viewridge Avenue, Suite 100, San Diego, CA, 92123.

12.     Defendant DAVID LEIBOWITZ is an individual and CEO of MULLIGAN FUNDING, LLC, ("MULLIGAN"), and MULLIGAN SENIOR, LLC, ("SENIOR") and is responsible for the conduct of both legal entities. DAVID LEIBOWITZ business address is 4715 Viewridge Avenue, Suite 100, San Diego, CA, 92123.

13.     Defendant ZACHARY STOLL, is an individual whose whereabouts is generally not known, although he is associated with various websites with either old addresses, fake addresses, "Vesian Suite" addresses and various "800" numbers and or email addresses. ZACHARY STOLL is doing business under various "DBA" business names including, but may not be limited to: Innovative Funding Solutions, IFS Capital and Advance My Business. ZACHARY STOLL has the following addresses associated with his emails or websites: 1999 Broadway, Suite 1525, Denver, CO 80202; 11130 Jollyville Road, Suite 202, Austin, Texas 78759. ZACHARY STOLL has the following Email addresses associated with his outgoing emails or websites: Zach@ifscapital.com.   ZACHARY STOLL has the following telephone numbers associated with his emails or websites: 970-300-2096; 970-315-3064; 888-592-6069; 800-393-2884.

## IV.  FACTUAL ALLEGATIONS

**Plaintiff's Business History**

14.     Plaintiff has been engaged in the business of tank trailer repair for approximately six (6) years.  The business provides physical repairs, special coatings and regulatory inspections to tank trailers in the State of Texas.  Plaintiff's business is a small business operation with annual gross revenue under $950,000 per year.  The company has 4 employees and occasionally utilizes sub-contractors.

15.     Plaintiff does not engage in any business outside the State of Texas.

16.     On or about January, 2021, Plaintiff became borderline insolvent due to Covid-19 related issues and was in need of additional capital funding for his daily operating expenses and to pay for ongoing business operations.

**The Financing Agreements**

1    **17.**    Defendants, and each of them, engage in providing small businesses funding in
2    the form of business loans or "merchant cash advance" loans.

3    **18.**    Defendants, and each of them, were agents of each other.

4    **19.**    Defendants, and each of them, provided Plaintiff with certain contract forms
5    indicating that Plaintiff would receive funds and pay a finance rate for the funds with weekly
6    payment schedules. (See Exhibit 2 and 3, attached hereto).

7    **20.**    On or about January 2021, Plaintiff was introduced to Defendant MULLIGAN
8    FUNDING, LLC, a finance company formed in Delaware.

9    **21.**    Plaintiff thereafter received a "Business Loan and Security Agreement" in the
10   face amount of $100,000. (See Exhibit 2, attached hereto).

11   **22.**    Plaintiff received $100,000 in his bank account on or about January 27, 2021, and
12   then paid back to Defendants total funds in the amount of $52,916 in weekly payments.

13   **23.**    On or about June, 2020, Plaintiff, was again in need of business capital because
14   the financial stress created by Defendant's business loan in January had drained the company.

15   **24.**    On or about June 25, 2021, Plaintiff entered a second "Business Loan and
16   Security Agreement" with Defendants in the amount of $129,083.    Said "second" loan
17   consolidated a balance from the first "Business Loan and Security Agreement" in the amount of
18   $74,083.15. (See Exhibit 3, attached hereto).

19   **25.**    Plaintiff received $55,000 in his bank account on or about June 26, 2021.
20   Plaintiff then paid back to Defendants, in weekly payments, the amount of $55,818.  The actual
21   effective interest rate is approximately 70.41 percent.  (See Exhibit 1, pg. 1 & 2, attached hereto).

22   **26.**    The actual funds paid back to Defendants to date is approximately 108,734.85.

23   **27.**    The approximate effective interest rate on the funds delivered to Defendants after
24   discharge of payments is approximately 70.41 percent. (See Exhibit 1, pg. 1, attached hereto).

25   **28.**    Each of the above stated financing agreements are in fact predatory and usurious
26   loan agreements that are in direct violation of the State of Texas public policy.

27   **29.**    The financing agreements require Plaintiff to pay a usurious rate of interest of
28   more than double the maximum legal rate of interest in violation of Texas law  (See Exhibit 1,

1  attached hereto).

2      **30.**    The above stated financing agreements required Plaintiff to agree to a forum

3  selection clause in State of Utah and a waiver of right to jury trial. (See exhibit 2 & 3 at

4  paragraphs 32, 33 and 43).

5      **31.**    These financing agreements appear in chart form as follows:

| Entity Name: | Date of Deposit of Loan Proceeds: | Total Funds Received: | Principal Amount: | Stated Interest Rate per Agreement: | Total Payments: | Actual Effective Interest Rate on Funds: |
|---|---|---|---|---|---|---|
| Mulligan Funding, LLC; Finwise Bank | 1/28/2021 | $100,000 | $100,000 | 27% | $52,916 | |
| Mulligan Funding, LLC; Finwise Bank | 6/25/2021 | $55,000 | $55,000 | 33.43% | $55,818 | |
| Totals: | | $155,000 | $155,000 | | $108,734 | 70.41% |

    **32.**    The Texas Finance Code, Section 302.001 and 349.002 states in relevant part:

    Sec. 302.001.
    CONTRACTING FOR, CHARGING, OR RECEIVING INTEREST OR TIME
    PRICE DIFFERENTIAL; USURIOUS INTEREST.

        (a)    A creditor may contract for, charge, and receive from an obligor interest or time price differential.

        (b)    The maximum rate or amount of interest is 10 percent a year except as otherwise provided by law. A greater rate of interest than 10 percent a year is usurious unless otherwise provided by law. All contracts for usurious interest are contrary to public policy and subject to the appropriate penalty prescribed by Chapter 305.

    Sec. 349.002.
    LIABILITY FOR CHARGES EXCEEDING TWICE AMOUNT AUTHORIZED.

        (a)    A person who violates this subtitle by contracting for, charging, or receiving interest or time price differential that in an aggregate amount exceeds twice the total amount of interest or time price differential authorized by this subtitle is liable to the obligor as an additional penalty for all principal or principal balance, as well as all interest or time price differential.

        (b)    A person who is liable under Subsection (a) is also liable for reasonable attorney's fees incurred by the obligor in enforcing this section.

- 6 -

33.     In Texas, contracting for, charging, or receiving interest that is greater than the statutory maximum is contrary to public policy and creditors that charge usurious interest are subject to penalties. (See Tex. Fin. Code §§ 302.001(c), 305.001).

34.     A transaction is usurious if it is a loan of money that requires a greater interest than allowed by law. (See Bernie's Custom Coach of Texas v. Small Business Administration, 987 F.2d 1195, 1197 (5th Cir. 1993) (quoting Myles v. Resolution Trust Corp., 787 S.W.2d 616, 617).

35.     The Texas usury statutes are penal in nature and are to be strictly construed. (Pearcy Marine, Inc. v. Acadian Offshore Services, Inc., 832 F. Supp. 192, 196 (S.D. Tex. 1993).

36.     Plaintiff is informed and believes and thereon alleges that, Pursuant to the provisions of the Texas Finance Code, each of the Defendants contracted for and charged thereon, a usurious interest on the finance agreements alleged herein.

37.     Plaintiff is informed and believes and thereon alleges that each of the Agreements alleged herein contract for and charge Plaintiff interest on said loans that in aggregate exceed twice the total amount of interest that is authorized by the provisions of the Texas Finance Code.

38.     Said amounts of interest therefore subject Defendants, and each of them, to liability for both principal and treble interest damages charged above the legal rate of interest under the terms of the Agreement.

39.     Plaintiff is informed and believes and thereon alleges that each of the Agreements alleged herein have a performance guaranty provision which make Plaintiff a personal guarantor and jointly and severally liable for the obligations under the Agreements.

40.     Plaintiff is informed and believes and thereon alleges that the form of the Agreements and each of the particular terms were nonnegotiable and absolutely required by the Defendants.

41.     Plaintiff is a small business and is not legally sophisticated.

42.     Plaintiff did not have an attorney review the financing agreement.

43.     Plaintiff was not asked or required by Defendants to have an attorney review the

1   financing agreement.

2       **44.**     Plaintiff is informed and believes and thereon alleges that based on the disparity

3   in the degree of sophistication and bargaining power between the parties, the Agreements were

4   effectively contracts of adhesion.

5       **45.**     Plaintiff is informed and believes and thereon alleges that the forum selection

6   clause and the choice-of-law clauses in each of the subject agreements between Plaintiff and

7   each Defendant are unenforceable because each of the Agreements contain a pre-dispute jury

8   waiver, and therefore the enforcement of forum selection clause and the choice-of-law clause

9   will deprive Plaintiff's of their substantive right to a jury trial that is guaranteed by the United

10  States Constitution.

11      **46.**     The Plaintiff is informed and believes and thereon alleges that the Defendants

12  were aware that Plaintiff is (1) a Texas resident; (2) located in the Western District of Texas; (3)

13  that Plaintiff had no other business contacts with California or Utah, (the Defendants' chosen

14  State for venue, choice-of-law and arbitration).

15      **47.**     Plaintiff is informed and believes and thereon alleges that the Defendants'

16  application and approval process at each and every step of the contracting process took place

17  strictly over the phone, by email and the internet.

18      **48.**     Plaintiff is informed and believes and thereon alleges that the purpose of using the

19  jury waiver and choice of law provisions in the financing agreements was to evade and

20  circumvent Texas regulations restricting the extraction of usurious interest on loans.

21      **49.**     Such efforts to suborn, evade, or dilute these important legal protections for

22  consumers through artifice, fraud, and clever drafting have been rejected by the Texas courts and

23  should be rejected in this case.

24      **50.**     Plaintiff is informed and believes and thereon alleges that the transactions

25  between the Plaintiff and the Defendants, when viewed in their totality, were loan transactions to

26  which Texas usury laws are applicable.

27      **51.**     The Plaintiff is informed and believes and thereon alleges that Defendants were

28  bound by the ten percent per annum usury limitation in Texas Finance Code

- 8 -

**52.** Defendants' interest rates under the Agreements substantially exceed the ten percent per annum limitation. Defendants thereby earned usurious profits which violate Texas usury laws.

**53.** Plaintiff is informed and believes and thereon alleges that Defendants unlawfully transacted business in the State of Texas by making usurious loans to Plaintiff through fraudulent and deceptive acts, which violates Texas Financial Code § 302.001 *et seq.*

**54.** Plaintiff is informed and believes and thereon alleges that the Defendants made no informational disclosures to the Debtor required by Texas or Federal law in loan transactions.

**55.** Plaintiff is informed and believes and thereon alleges that the Defendants made no TILA or Regulation Z disclosures with its loan to the Debtor, despite the disclosures being required by federal law.

**56.** Plaintiff was not represented by counsel at the time Plaintiff received funds from Defendants.

**57.** Plaintiff is a small business and is not sophisticated.

**58.** Plaintiff did not have the ability to understand the Agreements.

**59.** Wherefore, Plaintiff prays for judgment as set forth below.

**FIRST CAUSE OF ACTION**
**FRAUD**
(As To All Defendants)

**60.** Plaintiff hereby incorporates by reference each and every paragraph stated above.

**61.** Plaintiff is informed and believes and thereon alleges that Defendants misrepresented to Plaintiff that the financing Agreements would have a maximum interest rate of 27%.

**62.** Plaintiff is informed and believes and thereon alleges that each of the Defendants' Agreements were designed to effectuate a fraud upon the Plaintiff by disguising the actual interest rates payable on the Agreements.

**63.** Plaintiff is informed and believes and thereon alleges that Defendants, and each of them, failed to inform or disclose that the maximum interest rate chargeable under Texas law is

1  10%.

2      **64.**    Plaintiff relied upon and was in fact defrauded by these false inducements.

3      **65.**    Plaintiff is informed and believes and thereon alleges that when the Defendants

4  made the Agreements with Plaintiff, the Defendants knew that the effective annual interest rates

5  of their loans were substantially higher than 10% per annum usury cap under Texas law.

6      **66.**    The Defendants knowingly and intentionally entered into the Agreements with

7  Plaintiff in clear violation of Texas Civil Code § 1916-3 and the prohibitions against usury in the

8  Texas Finance Code.

9      **67.**    Plaintiff is informed and believes and thereon alleges that, in an obvious effort to

10  evade Texas' usury law, Defendants fraudulently added forum selection, governing law and jury

11  trial waiver clauses to the financing agreements.

12      **68.**    Texas law defines a "loan" as a "an advance of money that is made to or on behalf

13  of an obligor, the principal amount of which the obligor has an obligation to pay the creditor."

14  See Tex. Fin. Code § 301.002(a)(10). This definition exactly describes the transactions between

15  the Defendants and the Plaintiff.

16      **69.**    Plaintiff is informed and believes and thereon alleges that the Defendants, through

17  the alleged Agreements, including the negotiation methods utilized, defrauded Plaintiff by means

18  of misrepresentation and deception.

19      **70.**    Plaintiff is informed and believes and thereon alleges that Defendants

20  misrepresented the amount of the interest that Plaintiff would be obligated to pay in return.

21  Specifically, Defendant Mulligan represented to Plaintiff that the maximum interest he would be

22  obligated to pay would be 27 percent.  The final interest rate was in fact a much higher interest

23  percentage.

24      **71.**    Plaintiff is informed and believes and thereon alleges that each of the Defendants

25  omitted to inform Plaintiff that the loans were usurious and illegal under Texas law.

26      **72.**    Plaintiff is informed and believes and thereon alleges that each of the Agreements

27  include terms for forum selection and waiver of right to Jury trial.

28      **73.**    Plaintiff is informed and believes and thereon alleges that each of the said forum

selection and waiver of right to Jury trial are not conspicuous and or clearly labeled such that Plaintiff would be alerted to the fact that he is waiving important and fundamental Constitutional rights.

**74.** Plaintiff is informed and believes and thereon alleges that the form of the Agreements were dictated solely by the Defendants. That the Defendants carefully designed and calculated the form of the Agreements in order to deceive and subject Plaintiff into an illegal and usurious loan and subjected Plaintiff to harsh terms of an out of state forum and waiver of jury trial.

**75.** Plaintiff is informed and believes and thereon alleges that the Defendants never explained the terms of the Agreements to the Plaintiff.

**76.** Plaintiff was not represented by counsel at the time of executing the Agreements.

**77.** Plaintiff is a small business and is not legally sophisticated.

**78.** Plaintiff did not have the ability to fully appreciate and or understand the Agreements.

**79.** Plaintiff is informed and believes and thereon alleges that the Defendants made no TILA or Regulation Z disclosures with its loan to the Debtor, despite the disclosures being required by federal law.

**80.** Plaintiff is informed and believes and thereon alleges that although the Agreements clearly constituted loan transactions, the Defendants purposefully and carefully designed the documentation in an attempt to conceal the true nature of the transactions as usurious loans which are illegal under Texas law.

**81.** Plaintiff is informed and believes and thereon alleges that the terms of each of the Agreements setting the interest rate above 27 percent were material misrepresentations.

**82.** Plaintiff is informed and believes and thereon alleges that in addition to the misrepresentations alleged in the preceding paragraphs, the Defendants failed to make Federal and State mandated disclosures regarding the loans.

**83.** Plaintiff is informed and believes and thereon alleges that Plaintiff relied on the Defendants' misrepresentations and agreed to enter into the Agreements which directly resulted

- 11 -

in Plaintiff accepting the subject usurious loans from Defendants.

84.    Plaintiff is informed and believes and thereon alleges that the Plaintiff's reliance was reasonable due to the complicated nature of the Agreements, the lack of sophistication of the Plaintiff, and the Defendants' intentional concealment of the true nature and substance of the transactions under Texas law.

85.    Plaintiff is informed and believes and thereon alleges that all of the Defendants were aware that their representations, as alleged above, were false at the time they were made for the purpose of inducing the Plaintiff into entering into the Agreements and the Defendants were aware that the Plaintiff was relying on those representations.

86.    As a direct result of the acts of fraud and concealment, each and every agreement of Defendants are null and void.

87.    Plaintiff is informed and believes and thereon alleges that as a proximate result of the Defendants' fraudulent acts and representations, Plaintiff was damaged in amounts prayed for below and according to proof.

## SECOND CAUSE OF ACTION
### USURY
(As To All Defendants)

70.    Plaintiff hereby incorporates by reference each and every paragraph stated above.

71.    Plaintiff is informed and believes and thereon alleges that the Defendants' Agreements set forth loan transactions to which Texas usury laws are applicable.

72.    The Texas Finance Code, Section 302.001 and 349.002 prohibit "a greater rate of interest than 10 percent a year" and applies a higher penalty for exceeding twice the legal rate of interest.

73.    Plaintiff is informed and believes and thereon alleges that the Defendants' loans carried illegally usurious rates under Texas law.

74.    Plaintiff is informed and believes and thereon alleges that the interest rates carried by the Defendants' loans were usurious per se.

75.    Plaintiff is informed and believes and thereon alleges that the Defendants did not

satisfy any of the exemptions to Texas's usury limitations when they made the loans

76.    Plaintiff is informed and believes and thereon alleges that the Defendants knowingly, willfully, and intentionally charged interest on the sums advanced pursuant to the Agreements in excess of Texas's usury limitation.

77.    Plaintiff is informed and believes and thereon alleges that Equity and public policy dictate that the Defendants should not be allowed to receive any amounts paid in connection with the usurious loans.

78.    Plaintiff seeks an order from this Court (a) declaring that each of the Agreements entered into between each of the Defendants and Plaintiff were loan transactions, and thus, were illegal under Texas law as violating usury regulations; (b) ordering each of the Defendants to pay the Plaintiff all usurious interest previously paid by the Plaintiff to the Defendants in connection with the usurious loans, as well as a penalty equal to three times the amount of the interest paid on the loans; and (c) granting such other and further relief as this Court deems just and proper.

### THIRD CAUSE OF ACTION
### UNCONSCIONABILITY
(As To All Defendants)

79.    Plaintiff hereby incorporates by reference each and every paragraph stated above.

80.    Plaintiff is informed and believes and thereon alleges that the Defendants' Agreements with the Plaintiff set forth loan transactions to which Texas usury laws are applicable.

81.    Plaintiff is informed and believes and thereon alleges that the Plaintiff paid interest in excess of *twice* the maximum usury rate of 10% under Texas law.

82.    Plaintiff is informed and believes and thereon alleges that the entire context and atmosphere, both procedurally and substantively, within which Plaintiff was introduced to and ultimately executed the financing agreements, including the contracted interest rate of more than *twice* the maximum usury rate under Texas law is unconscionable and therefore should not be enforced.

83.    Plaintiff is informed and believes and thereon alleges that the Parties herein are in

extreme disparity with regard to knowledge, expertise and bargaining power regarding the financing agreements.

84.     Plaintiff is informed and believes and thereon alleges that the financing agreements, because they contract for an interest rate in excess of *twice* the maximum usury rate of 10% under Texas law, are in violation of Texas public policy.

85.     Plaintiff is informed and believes and thereon alleges that the financing agreements, as contracted for are unfair, unreasonable and oppressive in nature and are therefore in violation of Texas public policy.

86.     Plaintiff is informed and believes and thereon alleges that the terms of the Defendants' Agreements are unconscionable as a matter of law. This is also true because, among other issues, the weekly payments are grossly unfair and are onerous on their face.

87.     Plaintiff contends that the Defendants' finance agreements are unenforceable, and requests that the Court order that all amounts paid thereon be disgorged to the Plaintiff.

### FOURTH CAUSE OF ACTION
### NEGLIGENCE PER SE FOR VIOLATIONS OF
### TEXAS FINANCE CODE
(As To All Defendants Except FINWISE)

70.     Plaintiff hereby incorporates by reference each and every paragraph stated above.

71.     Texas has a strong public policy in favor of protecting its commercial borrowers.

72.     Plaintiff is informed and believes and thereon alleges that Defendants acted in the capacity of a lender without being licensed under the Texas Finance Code, commencing with section 342.051, which states in relevant part as follows:

> Sec. 342.051. LICENSE REQUIRED.
> (a) A person must hold a license issued under this chapter to:
>     (1) engage in the business of making, transacting, or negotiating loans subject to this chapter;  or
>     (2) contract for, charge, or receive, directly or indirectly, in connection with a loan subject to this chapter, a charge, including interest, compensation, consideration, or another expense, authorized under this chapter that in the aggregate exceeds the charges authorized under other law.
> (b) A person may not use any device, subterfuge, or pretense to evade the application of this section.

BROUSSARD V. MULLIGAN: COMPLAINT FOR FRAUD;USURY; UNCONSCIONABLITIY; NEGLIGENCE PER SE – VIOLATION OF TEXAS FINANCE CODE; UNJUST ENRICHMENT/ DISGORGEMENT; INJUNCTION AND DECLARATORY RELIEF

(c) A person is not required to obtain a license under Subsection (a) if the person is:
(1) a bank, savings bank, or savings and loan association organized under the laws of the United States or under the laws of the institution's state of domicile;...

73. Plaintiff is informed and believes and thereon alleges that each of these Defendants did "engage in the business of making, transacting, or negotiating loans" that are subject to the Texas Finance Code.

74. Plaintiff is informed and believes and thereon alleges that the Defendants had a duty to be licensed to participate in a loan of money in the State of Texas, and a duty to exercise due care with regard to lending money to Texas commercial borrowers.

75. Plaintiff is informed and believes and thereon alleges that Defendants failed to exercise due care by failing to become a licensed lender under Texas law and by failing to comply with other Texas' statutes and regulations pertaining to lending money.

76. Plaintiff is informed and believes and thereon alleges that Defendants' failure to comply with the Texas Finance Code was negligent, and that such negligence was the proximate cause of damages to the Plaintiff.

77. Plaintiff is a member of the class of persons intended to be protected by the provisions set forth under the Texas Finance Code.

78. Plaintiff is informed and believes and thereon alleges that Defendants' negligence was the proximate cause of damage to the Estate in an amount subject to proof.

79. Plaintiff prays for damages in the amount that Plaintiff paid to Defendants in excess of the amounts originally provided to Plaintiff as proceeds of the business loans.

### FIFTH CAUSE OF ACTION
#### Unjust Enrichment/Disgorgement
(As To All Defendants)

80. Plaintiff hereby incorporates by reference each and every paragraph stated above.

81. Plaintiff is informed and believes and thereon alleges that Defendants, and each of them, were unjustly enriched by receiving usurious interest and excessive fees in connection with their business loans provided to Plaintiff.

- 15 -

82.     Plaintiff is informed and believes and thereon alleges that the Defendants' business loans were not valid and unenforceable due to their violation of Texas usury laws. Accordingly, Plaintiff sues in the alternative in quasi-contract.

83.     Plaintiff is informed and believes and thereon alleges that the actions of the Defendants described above have harmed the Plaintiff and were inequitable and unjust in nature.

84.     Plaintiff is informed and believes and thereon alleges that as usurious lenders that committed wrongful and illegal acts to unjustly and unduly take advantage of the Plaintiff, each of the Defendants unjustly enriched themselves at the expense of the Plaintiff.

85.     Accordingly, the Plaintiff prays for restitution of all amounts the Plaintiff paid to the Defendants in excess of the amounts provided to Plaintiff.

## SIXTH CAUSE OF ACTION
## INJUNCTION AND DECLARATORY RELIEF
(As To All Defendants)

86.     Plaintiff hereby incorporates by reference each and every paragraph stated above.

87.     Plaintiff is entitled to a permanent injunction enjoining each of the Defendants, or anyone acting in concert with it or under its control, from taking any action to enforce the Agreements, or any related documents.

88.     Plaintiff seeks an order from this Court granting a permanent injunction enjoining the Defendants, and anyone acting in concert with it or under its control, from taking any action enforcing the Agreements or any related documents; and vacating enforcement mechanisms in connection with the Agreements; and granting such other and further relief as this Court deems just.

89.     A judicial declaration is necessary and appropriate at this time under the circumstances in order to determine the rights and duties of the parties relating to the finance agreements as follows.

   (a) That the Plaintiff and all of the Defendants entered into a loan transaction.
   (b) That the Agreement entered into between the Plaintiff and each of the Defendants set forth a loan transaction to which Texas usury laws are applicable.
   (c) That each of the Defendants' loans charged a usurious interest rate in Texas.

- 16 -

(d) That each of the Defendants' loans is usurious per se.

(e) That all and each of the Defendants knowingly charged a criminally usurious rate of interest on their loans and entered into the loans with usurious intent.

(f) That the Defendants' loans are void ab initio as criminally usurious, and therefore, all and each of the Defendants are precluded from recovering any remaining payments, installments or other fees due under the loans and must repay all payments made to date and that all documents and collateral be cancelled and surrendered.

90.    Plaintiff reserves its right to amend this Complaint to include, among other things, (i) further information regarding the funds subject to the business loans; (ii) additional loans; (iii) modifications of and revisions to the Defendants' names or owners; (iv) additional defendants; and (v) additional Plaintiffs and or causes of action that may become known to Plaintiff at any time during this action through formal discovery or otherwise and for the amendments to relate back to this Complaint.

91.    Plaintiff reserves the right to bring all other claims or causes of action that the Plaintiff might have against the Defendants, on any and all grounds, as allowed under the law or in equity.

**WHEREFORE**, Plaintiff prays for judgment against Defendants, and each of them, for the following relief according to proof at trial, together with reasonable attorney's fees and costs and all other relief the Court deems just and proper:

## ON THE FIRST CAUSE OF ACTION FOR FRAUD:

A. For an award of damages against the Defendants in an amount subject to proof;

B. For exemplary damages against the Defendants in an amount to be proven at trial;

## ON THE SECOND CAUSE OF ACTION FOR USURY:

A. For an order declaring that each of the Defendants Agreements are a loan transaction, and thus, illegal under Texas law;

B. An order that all and each of the Defendants repay the Plaintiff interest and other amounts previously paid by it in connection with the usurious loans;

- 17 -

**ON THE THIRD CAUSE OF ACTION FOR UNCONSCIONABILITY:**

A. For an order declaring each of the Agreements are unenforceable;

B. For an order disgorging all amounts paid on each of the Agreements to the Plaintiff;

**ON THE FOURTH CAUSE OF ACTION FOR NEGLIGENCE PER SE:**

A. For an award of damages against Defendants, and each of them, in an amount according to proof.

**ON THE FIFTH CAUSE OF ACTION FOR UNJUST ENRICHMENT AND DISGORGEMENT:**

A. For an order that all and each of the Defendants repay and be disgorged all interest and other amounts previously paid by the Debtor.

**ON THE SIXTH CAUSE OF ACTION FOR INJUNCTION AND DECLARATORY RELIEF:**

A. For an order from this Court, granting a permanent injunction enjoining all and each of the Defendants, as well as anyone acting in concert with them or under their control, from taking any action enforcing the Defendants' Agreements or any related document;

B. For an order vacating any other enforcement mechanisms in connection with the Agreements.

C. For a judicial declaration regarding the Defendants' loans finding:

(a) That the Plaintiff and all and each of the Defendants entered into a loan transaction subject to Texas law and that the Defendants attempt to transfer venue selection and governing law to State of Utah are not valid, nor is the waiver of jury trial.

(b) That the Agreement entered into between the Plaintiff and each of the Defendants set forth a loan transaction to which Texas usury laws are applicable.

(c) That each of the Defendants' loans charged a usurious interest rate in Texas.

(d) That each of the Defendants' loans is usurious per se.

(e) That all and each of the Defendants knowingly charged a criminally usurious rate of interest on their loans and entered into the loans with usurious intent.

(f) That the Defendants' loans are void ab initio as criminally usurious, and therefore, each of the Defendants are precluded from recovering any remaining payments, installments, fees or other compensation due under the business loans and must repay all payments made to date and that all documents and collateral be cancelled and surrendered.

AND FOR:

1.) General damages in an amount of $200,000;
2.) Special damages in the amount to be proved at trial;
3.) Double damages on all usurious interest that was contracted for in excess of twice the maximum legal rate of interest and in an amount to be proved at trial;
4.) Punitive damages according to proof;
5.) For such other and further relief as this Court deems just and proper.

## TRIAL BY JURY IS DEMANDED

Dated this 13th day of December, 2021.

Respectfully submitted,

Christopher Broussard
Muy Interstate 35 S.
Lytle, TX 78052

## VERIFICATION AND DEMAND FOR JURY TRIAL

I, the undersigned, am the plaintiff in this matter and make this verification and demand for jury trial; I have read the foregoing complaint, know the contents thereof, and from information and belief, believe the same to be true. I verify under penalty of perjury that the foregoing is true and correct. Furthermore, I demand a jury trial in this action.

DATED: December 13, 2021

Christopher Broussard

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26

Exhibit 1

27
28

BROUSSARD V. MULLIGAN: COMPLAINT FOR FRAUD;USURY; UNCONSCIONABLITIY; NEGLIGENCE PER SE – VIOLATION OF TEXAS
FINANCE CODE; UNJUST ENRICHMENT/ DISGORGEMENT; INJUNCTION AND DECLARATORY RELIEF

**Broussard Loan**
**Issued: January 28, 2021/June 25, 2021**
**Lender: FinWise Bank/Mulligan Funding**

<u>**Effective Interest Rate Analysis on Broussard Loan:**</u>

| FinWise Bank Charges on Broussard Loan: | |
|---|---:|
| Loan Proceeds on January 28, 2021: | 100,000 |
| Loan Proceeds on June 25, 2021 (consolidating $85,800 principal from1st loan and adding $55,000 additional proceeds to loan amount): | 55,000 |
| Total Loan Proceeds at Refinancing, ($155,000 - $14,200 paid down balance): | $140,800 |
| Amortized interest over 40 weekly payments: | 25,869 |
| Points on original loan: | 27,000 |
| Points on refinancing: | 14,850 |
| Refinancing fees: | 8,334 |
| Total Fees, Charges, Points and Interest: | $76,053 |
| **<u>Effective Interest Rate:</u>** | **70.41%** |

**Broussard**
**FinWise Loan**
**Amortization of Actual Activity**

| date | description | payment | 27% simple interest | principal | principal balance |
|---|---|---|---|---|---|
| 01.28.21 | loan proceeds | | | | 100,000.00 |
| 01.28.21 | points | | | | 27,000.00 |
| 01.28.21 | total loan amount | | | | 127,000.00 |
| 02.04.21 | | 2,519.85 | 657.62 | 1,862.23 | 125,137.77 |
| 02.11.21 | | 2,519.85 | 647.97 | 1,871.88 | 123,265.89 |
| 02.18.21 | | 2,519.85 | 638.28 | 1,881.57 | 121,384.32 |
| 02.25.21 | | 2,519.85 | 628.54 | 1,891.31 | 119,493.01 |
| 03.04.21 | | 2,519.85 | 618.74 | 1,901.11 | 117,591.90 |
| 03.11.21 | | 2,519.85 | 608.9 | 1,910.95 | 115,680.95 |
| 03.18.21 | | 2,519.85 | 599.01 | 1,920.84 | 113,760.11 |
| 03.25.21 | | 2,519.85 | 589.06 | 1,930.79 | 111,829.32 |
| 04.01.21 | | 2,519.85 | 579.06 | 1,940.79 | 109,888.53 |
| 04.08.21 | | 2,519.85 | 569.01 | 1,950.84 | 107,937.69 |
| 04.15.21 | | 2,519.85 | 558.91 | 1,960.94 | 105,976.75 |
| 04.22.21 | | 2,519.85 | 548.76 | 1,971.09 | 104,005.66 |
| 04.29.21 | | 2,519.85 | 538.55 | 1,981.30 | 102,024.36 |
| 05.06.21 | | 2,519.85 | 528.29 | 1,991.56 | 100,032.80 |
| 05.13.21 | | 2,519.85 | 517.98 | 2,001.87 | 98,030.93 |
| 05.20.21 | | 2,519.85 | 507.61 | 2,012.24 | 96,018.69 |
| 05.27.21 | | 2,519.85 | 497.19 | 2,022.66 | 93,996.03 |
| 06.03.21 | | 2,519.85 | 486.72 | 2,033.13 | 91,962.90 |
| 06.10.21 | | 2,519.85 | 476.19 | 2,043.66 | 89,919.24 |
| 06.17.21 | | 2,519.85 | 465.61 | 2,054.24 | 87,865.00 |
| 06.24.21 | | 2,519.85 | 454.97 | 2,064.88 | 85,800.12 |
| subtotal | | 52,916.85 | 11,716.97 | 41,199.88 | |
| 06.25.21 | loan proceeds | | | | 55,000.00 |
| 06.25.21 | points | | | | 14,850.00 |
| 06.25.21 | refinance fees | | | | 8,334.35 |
| 06.25.21 | total refinanced loan amount | | | | 163,984.47 |
| 07.01.21 | | 3,021.20 | 849.13 | 2,172.07 | 161,812.40 |
| 07.08.21 | | 3,021.20 | 837.88 | 2,183.32 | 159,629.08 |
| 07.15.21 | | 3,021.20 | 826.57 | 2,194.63 | 157,434.45 |
| 07.22.21 | | 3,021.20 | 815.21 | 2,205.99 | 155,228.46 |
| 07.29.21 | | 3,021.20 | 803.79 | 2,217.41 | 153,011.05 |
| 08.05.21 | | 3,021.20 | 792.3 | 2,228.90 | 150,782.15 |
| 08.12.21 | | 3,021.20 | 780.76 | 2,240.44 | 148,541.71 |
| 08.19.21 | | 3,021.20 | 769.16 | 2,252.04 | 146,289.67 |
| 08.26.21 | | 3,021.20 | 757.5 | 2,263.70 | 144,025.97 |
| 09.02.21 | | 3,021.20 | 745.78 | 2,275.42 | 141,750.55 |
| 09.09.21 | | 3,021.20 | 734 | 2,287.20 | 139,463.35 |
| 09.16.21 | | 3,021.20 | 722.15 | 2,299.05 | 137,164.30 |

| | | | | |
|---|---|---|---|---|
| 09.23.21 | 3,021.20 | 710.25 | 2,310.95 | 134,853.35 |
| 09.30.21 | 3,021.20 | 698.28 | 2,322.92 | 132,530.43 |
| 10.07.21 | 3,021.20 | 686.25 | 2,334.95 | 130,195.48 |
| 10.14.21 | 3,021.20 | 674.16 | 2,347.04 | 127,848.44 |
| 10.21.21 | 3,021.20 | 662.01 | 2,359.19 | 125,489.25 |
| 10.28.21 | 3,021.20 | 649.79 | 2,371.41 | 123,117.84 |
| 11.04.21 | 1,436.40 | 637.51 | 798.89 | 122,318.95 |
| subtotal | 55,818.00 | 14,152.48 | 41,665.52 | |
| total | 108,734.85 | 25,869.45 | 82,865.40 | |

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Exhibit 2

BROUSSARD V. MULLIGAN: COMPLAINT FOR FRAUD;USURY; UNCONSCIONABLITIY; NEGLIGENCE PER SE – VIOLATION OF TEXAS
FINANCE CODE; UNJUST ENRIGHMENT/ DISGORGEMENT; INJUNCTION AND DECLARATORY RELIEF



## BUSINESS LOAN AND SECURITY AGREEMENT
## SUPPLEMENT

This Business Loan and Security Agreement Supplement is part of (and incorporated by reference into) the Business Loan and Security Agreement. Borrower should keep this important legal document for Borrower's records.

| | |
|---|---|
| **Borrower:** | **Apex Services Group LLC dba - Apex Services Group** |
| **Lender:** | **FinWise Bank** |
| **Existing Balance to be Paid Off:**<br><br>Amount of Existing Balance owed to any third party lender or provider of funding, which will be paid as of the Effective Date of this Loan Agreement and will be deducted from your Disbursement Amount | **$0.00** |
| **Existing Balance to be Consolidated:**<br><br>Amount of Existing Balance owed to Lender in respect of an existing loan, which Existing Balance WILL NOT be paid off, but will be Consolidated with the New Funding Amount as of the Effective Date of this Loan Agreement as set forth in the Total Funding Amount | **$0.00** |
| **New Funding Amount:** | **$100,000.00** |
| **Total Funding Amount:**<br><br>The sum of the Existing Consolidated Balance (if any) and the New Funding Amount | **$100,000.00** |
| **Origination Fee** | **$0.00** |
| **Interest Charge in respect of the New Funding Amount:**<br><br>Dollar amount of interest that the New Funding Amount will cost (does not include any Fees) | **$27,000.00** |
| **Interest Charge in respect of the Existing Consolidated Balance:**<br><br>Dollar amount of interest that will be charged for the consolidation of any Existing Consolidated Balance with the New Funding Amount (if applicable) | **$0.00** |
| **Total Repayment Amount:**<br><br>Sum of Total Funding Amount, Interest Charge in Respect of the New Funding Amount, and Interest Charge in Respect of the Existing Consolidated Balance (if any), when all payments are made on time | **$127,000.00** |
| **Payment Schedule and Term:** | **50.4** payments of **$ 2,519.85** due each **Business Week** beginning on the first business day after the Disbursement Amount is disbursed. (collectively, the **Weekly** Repayment Amount")<br><br>*"Business day" means any Monday through Friday, except for Federal Reserve holidays, and "Business Week" has a corresponding meaning.* |
| **Disbursement Amount:**<br><br>New Funding Amount less the Existing Paid Off Balance (if any), less the Origination Fee | **$100,000.00** |
| **Simple Interest Rate on New Funding Amount:**<br><br>(Interest rate paid on Amount of Loan if all payments made as scheduled. This Interest Rate is not an annualized interest rate) | **27.0%** |
| **Fees:** | Returned Payment Fee: **$25.00** |

1

DocuSign Envelope ID: 7C679B27-57A4-48FA-B575-BB78C926A2A3



| Prepayment Discount Percentage: | A "Prepayment Discount Percentage" of 6% of the full balance then remaining on the Loan will apply with respect to this Loan to the extent that the Borrower prepays this Loan in whole in accordance with, and subject to, Section 10 of the Business Loan and Security Agreement. |
| --- | --- |

## Interest Rate

The simple interest rate disclosed on this Business Loan and Security Agreement Supplement (the "Interest Rate") is the rate of interest calculated by dividing the Amount of the New Funding Amount by the Interest Charge in respect of the New Funding Amount. This calculation assumes that all payments are made as scheduled. **THIS SIMPLE INTEREST RATE DOES NOT INCLUDE ANY FEES AND IS NOT ANNUALIZED AND, THEREFORE, IS NOT AN ANNUAL PERCENTAGE RATE ("APR").**

The APR equals a single percentage number that represents the actual yearly cost of funds over the term of a loan and includes any fees or additional costs associated with the loan. The APR on this loan can be compared to the APR of other loan programs to give you a consistent means of comparing rates and programs to the extent programs have different loan terms and fee structures.

Attached to this Business Loan and Security Agreement Supplement is a **SMART Box™ Capital Comparison Tool**, which is provided to help you understand and assess the cost of your small business financing in a variety of different ways, in order to assist that understanding as fully as possible.

## Loan Pricing Disclosure

Lender uses a system of risk-based pricing to determine Loan amounts, interest charges and fees. Risk-based pricing is a system that evaluates the risk factors of your application and adjusts the amount of the Loan, its term and the interest rate and discounts points up or down based on this risk evaluation.

Although Lender believes that its loan process provides expedited turnaround time and its underwriting process provides greater likelihood of approval of your loan, this loan may be a higher cost loan than loans that may be available through other lenders. You should fully consider all costs and fees associated with this loan and compare your available alternatives to this loan. You are encouraged to engage appropriate advisors to the extent you believe necessary to evaluate the terms of this loan.

## ELECTRONIC SIGNATURE

Borrower and each Guarantor (as defined in the Business Loan and Security Agreement below) agree that any electronic signature provided to Lender in connection with the Business Loan and Security Agreement Supplement, the Business Loan and Security Agreement,, the Authorization Agreement for Direct Deposit (ACH Credit) and Direct Payments (ACH Debits), and any other agreement between the parties related to the subject matter contained therein shall have the same force and effect as a manual signature. As used herein, the term "**electronic signature**" means any electronic sound, symbol or process attached to or logically associated with a record and executed and adopted by a person or entity with the intent to sign such record on behalf of Borrower or Guarantor (as applicable).

## LOAN FOR SPECIFIC PURPOSES ONLY

The proceeds of the requested Loan may solely be used for the specific purposes as set forth in the Use of Proceeds Certification of the Business Loan and Security Agreement. **IN ADDITION, THE LOAN WILL NOT BE USED FOR PERSONAL, FAMILY OR HOUSEHOLD PURPOSES.** Borrower understands that Borrower's agreement not to use the Loan proceeds for personal, family or household purposes means that certain important duties imposed upon entities making loans for consumer/personal purposes, and certain important rights conferred upon consumers, pursuant to Federal or State law will not apply to this transaction.

## CERTIFICATION RELATED TO BORROWER'S OWNERSHIP

If Borrower has an Existing Consolidated Balance owed to the Lender or Existing Paid Off Balance owed to a third party (each as defined above), by signing below, Borrower certifies and confirms that there have been no changes to its beneficial ownership since the initial funding related to the Existing Balance in question.

**Please sign this document here:**

DocuSigned by:

Christopher Broussard

—545D7B2B20CB419…

**Christopher Broussard**

2

DocuSign Envelope ID: 7C679B27-57A4-48FA-B575-BB78C926A2A3


Mulligan Funding

| Borrower: Apex Services Group LLC | Lender: FinWise Bank |
|---|---|

| **SMART**BOX™<br><br>Capital Comparison Tool | The SMART Box™ is provided to help you understand and assess the cost of your small business financing. *The calculations below involve certain key assumptions, including that the Loan is paid off in its entirety according to the agreed payment schedule and that no repayments are missed.* |
|---|---|

| Loan Amount | Disbursement Amount [†] | Total Repayment Amount | Term |
|---|---|---|---|
| **$ 100,000.00** | **$ 100,000.00** | **$ 127,000.00** | **12.0 Months**<br>(repaid Weekly) |

| *METRIC* | *METRIC CALCULATION* | | *METRIC EXPLANATION* |
|---|---|---|---|
| **Total Cost of Credit**<br><br>**$ 27,000.00** | Interest Expense/ Loan Fee:<br>Origination Fee:<br>Other Fees:<br>**Total Cost of Credit:** | **$ 27,000.00**<br>**$ 0.00**<br>**$0.00**<br>**$ 27,000.00** | This is the total amount that you will pay in Interest Expense/Loan Fees and other fees.<br><br>The amount does not include fees and other charges you can avoid, such as late payment fees and returned payment fees.[2] |
| **Annual Percentage Rate (APR) 3**<br><br>**49.08 %** | Your Loan will have **50.4 Weekly** payments of:<br><br>APR: | **$ 2,519.85**<br><br>49.08 % | This is the cost of the Loan – including total Interest Expense/Loan Fees and other fees – expressed as an annual rate. APR takes into account the amount and timing of funding you receive, fees you pay, and the periodic payments you make.<br><br>While APR can be used for comparison purposes, APR is not used to calculate your Interest Expense/Loan Fees. APR may not equal the interest rate applied to a Loan.[4] |
| **Average Monthly Payment**<br><br>**$ 10,583.33** | Total Repayment Amount:<br>Term (in months):<br>**Average Monthly Payment:** | **$ 127,000.00**<br>**÷ 12.0 Months**<br>**$ 10,583.33** | This is the average monthly repayment amount, which does not include fees and other charges you can avoid, such as late payment fees and returned payment fees.[2]<br><br>The actual repayment frequency for the Loan will be [daily/weekly]. This is an estimate for comparison purposes only. |
| **Cents on Dollar**<br><br>**$ 0.270** | Total Cost of Credit<br>Loan Amount:<br>**Cents on Dollar:** | **$ 27,000.00**<br>**÷ $ 100,000.00**<br>**$ 0.270** | This is the total amount that you will pay in Interest Expense/Loan Fees and other fees per dollar borrowed. |
| **Security Interest and Collateral Requirements** | Is this Loan secured? | | **Yes**<br>*(See Section 11)* |
| | Is this Loan Collateralized? | | **No** |
| **Personal Guarantee** | Does this Loan require a personal guarantee of payment? | | **Yes**<br>*(see Section 48)* |



| | | |
|---|---|---|
| **Prepayment** | If I prepay the outstanding loan amount, will I be required to pay any new fees or charges not included in the Total Cost of Credit? | **No** |
| | If I prepay the outstanding loan amount, will I be required to pay any remaining [Interest Expense/Loan Fees]? | **No** *(see Section 10)* |

[1] The Disbursement Amount is the amount of funding that you will receive and may be different from the Loan Amount.  The Disbursement Amount is net of fees withheld. A portion of the Disbursement Amount may be used to pay off any amounts owed from a prior loan or an amount owed to a third party.

[2] Your business may incur other fees that are not a condition of borrowing, such as late payment fees, returned payment fees, or monthly maintenance fees. Those fees are not reflected here. See the agreement for details on these fees (see Section 20).

[3] APR is calculated here according to the principles of 12 C.F.R. § 1026 (Regulation Z), using 12 payment periods of equal length and 50.4 payment dates per year for weekly pay products and 252 payment dates per year for daily pay products]. APR is not a substitute for interest rate and is not calculated according to state-specific laws governing interest rates.

[4] Your loan is made by FinWise Bank under the laws of the state of Utah, including those governing the amount and rates of interest that Utah-based lenders may impose (see Section 40).

© 2019 Innovative Lending Platform Association. All rights reserved. Innovative Lending Platform Association is not responsible for any misuse of the SMART Box™ or any inaccuracies in the calculations or information included therein.



**AUTHORIZATION AGREEMENT FOR
DIRECT DEPOSIT (ACH CREDIT) AND
DIRECT PAYMENTS (ACH DEBITS)**

**This Authorization Agreement for Direct Deposit (ACH Credit) and Direct Payments (ACH Debits) is part of (and incorporated by reference into) the Business Loan and Security Agreement. Borrower should keep this important legal document for Borrower's records.**

**DISBURSMENT OF LOAN PROCEEDS.** By signing below, Borrower authorizes Lender to disburse the Loan proceeds less the amount of any applicable fees upon Loan approval by initiating an ACH credit, wire transfer or similar means to the checking account indicated below (or a substitute checking account Borrower later identifies and is acceptable to Lender) (hereinafter referred to as the "Designated Checking Account") in the Disbursement Amount set forth in the accompanying Business Loan and Security Agreement Supplement. This authorization to credit Loan proceeds to Borrower's Designated Checking Account is to remain in full force and effect until (a) Lender has received written notification from Borrower of its termination in such time and in such manner as to afford Lender and Borrower's depository bank a reasonable opportunity to act on it, or (b) Borrower has satisfied all of its obligations set forth in the Business Loan and Security Agreement.

**AUTOMATIC PAYMENT PLAN.** Enrollment in Lender's Automatic Payment Plan, by signature of this Authorization Agreement, is required for Loan approval.  By signing below, Borrower agrees to enroll in the Automatic Payment Plan and authorizes Lender to collect payments required under the terms of Borrower's Business Loan and Security Agreement by initiating ACH debit entries to the Designated Checking Account in the amounts and on the dates provided in the Payment Schedule set forth in the accompanying Business Loan and Security Agreement Supplement. Borrower authorizes Lender to increase the amount of any scheduled ACH debit entry or assess multiple ACH debits for the amount of (i) any previously scheduled payment(s) that was not paid as provided in the payment schedule and (ii) any unpaid Fees. This authorization to debit Borrower's Designated Checking Account is to remain in full force and effect until Lender has received written notification from Borrower of its termination in such time and in such manner as to afford Lender and Borrower's depository bank a reasonable opportunity to act on it or Borrower has satisfied all of its obligations set forth in the Business Loan and Security Agreement. Lender may suspend or terminate Borrower's enrollment in the Automatic Payment Plan immediately if Borrower fails to keep Borrower's designated checking account in good standing or if there are insufficient funds in Borrower's checking account to process any payment. **If Borrower revokes the authorization or Lender suspends or terminates Borrower's enrollment in the Automatic Payment Plan because of the inability to process debits to Borrower's Designated Checking Account, Borrower will be in "Default" of the Business Loan and Security Agreement as such term is defined in Section 29 therein.   Upon default, Borrower will remain responsible for making timely payments pursuant to the alternative payment methods described in the Business Loan and Security Agreement.**

**BUSINESS PURPOSE ACCOUNT.** By signing below, Borrower attests that the Designated Checking Account was established for business purposes and not primarily for personal, family or household purposes.

**ACCOUNT CHANGES.** Borrower agrees to notify Lender promptly if there are any changes to the account and routing numbers of the Designated Checking Account.

**MISCELLANEOUS.** Lender is not responsible for any fees charged by Borrower's bank as the result of credits or debits initiated under this agreement. The origination of ACH transactions to Borrower's account must comply with the provisions of U.S. law.

Depository Name: **Security Service Federal Credit Union**

Branch:

City: _____ State: _____ Zip: _____

Routing Number: **314088XXX**                              Account Number: **643077XXXX**

Print Business Account Holder Name: **Christopher  Broussard**                    Tax ID Number: **47-555XXXX**

Signature: *Christopher Broussard*                          Title: Managing  Partner
Date: 1/28/2021

US_140305676v2_391927-00001 7/16/2019 9:39 PM



# BUSINESS LOAN AND SECURITY AGREEMENT

**SECTION 1.** **INTRODUCTION.** This Business Loan and Security Agreement ("Agreement") governs your business loan ("Loan") from FinWise Bank. Please read it and keep it for your reference. In this Agreement, the words "you," "your" and "Borrower" means each individual or entity that signs this Agreement or on whose behalf this Agreement is signed. The words "Lender," "we," "us", and "our" mean FinWise Bank or its successor, assigns, agents, and servicers.

**SECTION 2.** **EFFECTIVE DATE.** This Agreement begins on the date we disburse the Disbursement Amount from Utah (the "Effective Date"). Borrower understands and agrees that Lender may postpone, without penalty, the disbursement of amounts to Borrower until (i) all required security interests have been perfected, (ii) Lender has completed its required diligence related to its "know your customer" obligations under federal law, (iii) Lender has received all required personal guarantees or other documentation; and (iv) Lender has reviewed all documents and information required in connection with underwriting the Loan and has approved the Loan for funding.

**SECTION 3.** **AUTHORIZATION.** Borrower agrees that the Loan made by Lender to Borrower shall be conclusively deemed to have been authorized by Borrower and to have been made pursuant to a duly authorized request on its behalf.

**SECTION 4.** **LOAN FOR SPECIFIC PURPOSES ONLY.** The proceeds of the requested Loan may solely be used for the specific purposes as set forth in the Use of Proceeds Certification contained in Section 49 below, and not for any other purpose, including personal, family or household purposes. Borrower and each Guarantor understands that Borrower's agreement not to use the Loan proceeds for personal, family or household purposes means that certain important duties imposed upon entities making loans for consumer/personal purposes, and certain important rights conferred upon consumers, pursuant to federal or state law will not apply to the Loan or the Agreement. Borrower and each Guarantor also understand that Lender will be unable to confirm whether the use of the Loan conforms to this section. Borrower and each Guarantor agrees that a breach by Borrower of the provisions of this section will not affect Lender's right to (i) enforce Borrower's promise to pay for all amounts owed under this Agreement, regardless of the purpose for which the Loan is in fact obtained; or (ii) use any remedy legally available to Lender, even if that remedy would not have been available had the Loan been made for consumer purposes.

**SECTION 5.** **DISBURSEMENT OF LOAN PROCEEDS AND MAINTENANCE OF BORROWER'S BANK ACCOUNT.** If Borrower applied and is approved for a Loan, Borrower's Loan will be disbursed, upon approval, as provided in the accompanying Authorization Agreement for Direct Deposit (ACH Credit) and Direct Payments (ACH Debits). Borrower agrees to maintain Direct Payments (ACH Debits) in its Designated Checking Account, which is the account that was reviewed in conjunction with underwriting and approval of this Loan (including keeping such account open until the Total Repayment Amount had been completely repaid. Any change to the Designated Checking Account must be approved in advance by Lender in its sole discretion.

**SECTION 6.** **PROMISE TO PAY.** Borrower agrees to pay Lender the Total Repayment Amount shown in the accompanying Business Loan and Security Agreement Supplement in accordance with the Payment Schedule shown in the Business Loan and Security Agreement Supplement. Borrower agrees to enroll in Lender's Automatic Payment Plan and authorizes Lender to collect required payments as provided in the accompanying Authorization Agreement for Direct Deposit (ACH Credit) and Direct Payments (ACH Debits). Borrower attests that the Designated Checking Account was established by Borrower and the Loan proceeds will be used for business purposes only and not for personal, family, or household purposes.

**SECTION 7.** **ALTERNATIVE PAYMENT METHODS.** If Borrower knows that for any reason Lender will be unable to process a payment under Lender's Automatic Payment Plan, then Borrower must either restore sufficient funds such that the missed payment can be collected as provided in the accompanying Authorization Agreement for Direct Deposit (ACH Credit) and Direct Payments (ACH Debits), provide funds in a manner approved by Lender which may include the acceptance of a check; or, if offered, make the missed payment by any pay-by-phone or on-line service that Lender may make available from time to time. All alternative payments must be made in good funds by check, money order, wire transfer, automatic transfer from an account at an institution offering such service, or other instrument in U.S. Dollars. Borrower understands and agrees that payments made at any other address than as specified by Lender may result in a delay in processing and/or crediting. If Borrower makes an alternative payment on Borrower's Loan by any pay-by-phone or on-line service that Lender makes available while Borrower is enrolled in the Automatic Payment Plan, Lender may treat such payment as an additional payment and continue to process Borrower's scheduled Automatic Payment Plan payments or may reduce any scheduled Automatic Payment Plan payment by the amount of any such additional payment received, in its sole discretion.

**SECTION 8.** **APPLICATION OF PAYMENTS.** Subject to applicable law, Lender reserves the right to apply payments to Borrower's Loan in any manner Lender chooses in Lender's sole discretion it being understood and agreed that any fees and interest will generally be paid during the earlier portion of the term.

**SECTION 9.** **POSTDATED CHECKS, RESTRICTED ENDORSEMENT CHECKS AND OTHER DISPUTED OR QUALIFIED PAYMENTS.** Lender can accept late, postdated or partial payments without losing any of Lender's rights under this Agreement (a



postdated check is a check dated later than the day it was actually presented for payment). Lender is under no obligation to hold a postdated check and Lender reserves the right to process every item presented as if dated the same date received by Lender or Lender's check processor unless Borrower gives Lender adequate notice and a reasonable opportunity to act on it. Except where such notice and opportunity is given, Borrower may not hold Lender liable for depositing any postdated check. **Borrower agrees not to send Lender partial payments marked "paid in full," "without recourse," or similar language. If Borrower sends such a payment, Lender may accept it without losing any of Lender's rights under this Agreement. All notices and written communications concerning postdated checks, restricted endorsement checks (including any check or other payment instrument that indicates that the payment constitutes "payment in full" of the amount owed or that is tendered with other conditions or limitations or as full satisfaction of a disputed amount) or any other disputed, nonconforming or qualified payments, must be mailed or delivered to Mulligan Funding, LLC, 4715 Viewridge Avenue, Suite 100, San Diego, CA 92123, Attn: Accounting Dept.**

       **SECTION 10.**       **PREPAYMENT.** Borrower may prepay Borrower's Loan in whole on any Business Day by paying Lender the sum total of the Total Repayment Amount, and any Returned Payment Fees, in each case as described in the accompanying Business Loan and Security Agreement Supplement less (i) any Loan payments made prior to such prepayment; and (ii) the product of (X) the percentage identified as the applicable Prepayment Discount Percentage in the accompanying Business Loan and Security Agreement Supplement; and (Y) the aggregate amount remaining on the Borrower's Loan as of such date as determined by Lender's records in accordance with Section 8, provided however that (a) at the time of the prepayment in question, Borrower's account is current and in good standing, and Borrower is not in breach of any of the terms of The Agreement; (b) this discount shall only be applicable if the payment in question is made directly from the Designated Checking Account, and not from the account of any other lender which is a competitor of the Lender's; (c) the payment is not effectively funded by the receipt by the Borrower of a loan or advance provided by a direct competitor of the Lender's; and (d) the full balance owing by the Borrower shall be paid and thereafter, within 3 business days of receipt by the Lender of proof to its reasonable satisfaction that the conditions described in (a), (b) and (c) above have been met, which proof will include at least the provision by the Borrower of its banking transaction reports for the two week period immediately preceding and the two week period immediately following the payoff in question, the amount of the discount shall be re-funded into the Designated Checking Account by the Lender. Borrower may prepay Borrower's Loan in part on any Business Day and such payment shall be applied against the Total Repayment Amount, and any Returned Payment Fees, in each case as described in the accompanying Borrower's Business Loan and Security Agreement Supplement.

       **SECTION 11.**       **SECURITY INTEREST.** Borrower and/or Guarantor hereby grants to Lender, the secured party hereunder, a continuing security interest in and to any and all "Collateral" as described below to secure payment and performance of all debts, liabilities and obligations of Borrower to Lender hereunder and also any and all other debts, liabilities and obligations of Borrower to Lender of every kind and description, direct or indirect, absolute or contingent, primary or secondary, due or to become due, now existing or hereafter arising, whether or not such obligations are related to the Loan described in this Agreement, by class, or kind, or whether or not contemplated by the parties at the time of the granting of this security interest, regardless of how they arise or by what agreement or instrument they may be evidenced or whether evidenced by any agreement or instrument, and includes obligations to perform acts and refrain from taking action as well as obligations to pay money including, without limitation, all interest, other fees and expenses (all hereinafter called "Obligations"). The Collateral includes the following property that Borrower (or Guarantor, if applicable pursuant to Section 12) now owns or shall acquire or create immediately upon the acquisition or creation thereof: (i) any and all amounts owing to Borrower now or in the future from any merchant processor(s) processing charges made by customers to Borrower via credit card or debit card transactions; and (ii) all other tangible and intangible personal property, including, but not limited to (a) cash and cash equivalents, (b) inventory, (c) equipment, (d) investment property, including certificated and uncertificated securities, securities accounts, security entitlements, commodity contracts and commodity accounts, (e) instruments, including promissory notes (f) chattel paper, including tangible chattel paper and electronic chattel paper, (g) documents, (h) letter of credit rights, (i) accounts, including accounts receivables, (j) deposit accounts, (k) commercial tort claims, (l) general intangibles, including payment intangibles and software and (m) as-extracted collateral as such terms may from time to time be defined in the Uniform Commercial Code. The security interest Borrower (or Guarantor, if applicable, pursuant to Section 12) grants includes all accessions, attachments, accessories, parts, supplies and replacements for the Collateral, all products, proceeds and collections thereof and all records and data relating thereto. Lender disclaims any security interest in household goods in which Lender is forbidden by law from taking a security interest.

       **SECTION 12.**       **PROTECTING THE SECURITY INTEREST.** Borrower and each Guarantor agrees that Lender and/or Lender's Representative may file any financing statement, lien entry form or other document Lender and/or Lender's Representative requires in order to perfect, amend or continue Lender's security interest in the Collateral and Borrower and each Guarantor agrees to cooperate with Lender and Lender's Representative as may be necessary to accomplish said filing and to do whatever Lender or Lender's Representative deems necessary to protect Lender's security interest in the Collateral. Borrower and each Guarantor agree that, if any Guarantor is a corporate entity, then Lender or Lender's Representative may file any financing statement, lien entry form or other document against such Guarantor or its property that Lender and/or Lender's Representative requires in order to perfect, amend or continue Lender's security interest in the Collateral. Any such Guarantor agrees to cooperate with Lender and Lender's Representative as may be necessary to accomplish said filing and to do whatever Lender and Lender's Representative deems necessary to protect Lender's security interest in the Collateral. In this Agreement, "Lender's Representative" means any entity or individual that is designated by Lender to serve in such capacity.

       **SECTION 13.**       **LOCATION OF COLLATERAL; TRANSACTIONS INVOLVING COLLATERAL.** Unless Lender has agreed otherwise in writing, Borrower agrees and warrants that (i) all Collateral (or records of the location of the case of accounts, chattel paper and general intangibles) shall be located at Borrower's address as shown in the application; (ii) except for inventory sold or accounts collected in the ordinary course of Borrower's business, Borrower shall not sell, offer to sell, or otherwise transfer or dispose of the Collateral; (iii) no one

7



else has any interest in or claim against the Collateral that Borrower has not already disclosed to Lender in writing prior to the Effective Date; (iv) Borrower shall not pledge, mortgage, encumber or otherwise permit the Collateral to be subject to any lien, security interest, encumbrance or charge, other than the security interest provided for in this Agreement without written consent of Lender; and (v) Borrower shall not sell, offer to sell, or otherwise transfer or dispose of the Collateral for less than the fair market value thereof. Borrower shall defend Lender's rights in the Collateral against the claims and demands of all other persons. All proceeds from any unauthorized disposition of the Collateral shall be held in trust for Lender, shall not be co-mingled with any other funds and shall immediately be delivered to Lender. This requirement, however, does not constitute consent by Lender to any such disposition.

**SECTION 14.** **TAXES, ASSESSMENTS AND LIENS.** Borrower will complete and file all necessary federal, state and local tax returns and will pay when due all taxes, assessments, levies and liens upon the Collateral. Borrower shall provide evidence of such payments to Lender upon request.

**SECTION 15.** **INSURANCE.** Borrower shall procure and maintain such insurance as Lender may require with respect to its Collateral, real property, commercial liability, fire, theft, and other risks, in form, amounts and coverage reasonably acceptable to Lender and issued by a company reasonably acceptable to Lender naming Lender as loss payee. If Borrower at any time fails to obtain or maintain any insurance as required under this Agreement, Lender may at its option obtain such insurance as Lender deems appropriate at Borrower's sole cost and expense. Borrower shall promptly notify Lender of any loss of or damage to the Collateral. Lender is under no obligation to purchase any particular type of amount of coverage. Borrower and each Guarantor acknowledge that the cost of any insurance coverage so obtained might significantly exceed the cost of insurance that Borrower could have obtained.

**SECTION 16.** **REPAIRS AND MAINTENANCE.** Borrower and each Guarantor agree to keep and maintain, and to cause others to keep and maintain, the Collateral in good order, repair and condition at all times while this Agreement remains in effect. Borrower further agrees to pay when due all claims for work done on, or services rendered or material furnished in connection with the Collateral so that no lien or encumbrance may ever attach to or be filed against the Collateral.

**SECTION 17.** **INSPECTION OF COLLATERAL AND PLACE OF BUSINESS; USE OF PHOTOGRAPHS AND TESTIMONIALS.** Lender and Lender's designated representatives and agents shall have the right during Borrower's normal business hours and at any other reasonable time to examine the Collateral wherever located and the interior and exterior of any Borrower's place of business. During an examination of any Borrower's place of business, Lender may examine, among other things, whether Borrower (i) has a place of business that is operational and separate from any personal residence; (ii) is open for business; (iii) has sufficient inventory to conduct Borrower's business; or (iv) has one or more credit card terminals if Borrower processes credit card transactions. When performing an examination, Lender may photograph the interior and exterior of any Borrower place of business, including any signage, and may photograph any individual who has signed the Agreement ("Signatory") unless the Signatory previously has notified Lender that he or she does not authorize Lender to photograph the Signatory. Lender may obtain testimonials from any Signatory, including testimonials on why Borrower needed the Loan and how the Loan has helped Borrower. Any photograph and testimonial will become and remain the sole property of Lender. Borrower and each Signatory grant Lender the irrevocable and permanent right to display and share any photograph and testimonial in all forms and media, including composite and modified representations, for all purposes, including but not limited to any trade or commercial purpose, with any Lender employees and agents and with the general public. Lender may, but is not required to, use the name of any Borrower and Signatory as a credit in connection with any photograph and testimonial. Borrower and each Signatory waive the right to inspect or approve versions of any photograph or testimonial or the written copy or other media that may be used in connection with same. Borrower and each Signatory release Lender from any claims that may arise regarding the use of any photograph or testimonial, including any claims of defamation, invasion of privacy or infringement of moral rights, rights of publicity or copyright.

**SECTION 18.** **LENDER'S EXPENDITURES.** If any action or proceeding is commenced that would materially affect Lender's interest in the Collateral as described above and in the Personal Guaranty set forth in Section 48 (if applicable), or if Borrower fails to comply with any provision of this Agreement or any related documents, including but not limited to Borrower's failure to discharge or pay when due any amounts Borrower is required to discharge or pay under this Agreement or any related documents, Lender on Borrower's behalf may (but shall not be obligated to) take any action that Lender deems appropriate, including but not limited to discharging or paying all taxes, liens, security interest, encumbrances and other claims, at any time levied or placed on the Collateral and paying all costs for insuring, maintaining and preserving the Collateral. To the extent permitted by applicable law, all such expenses will become a part of the Obligations and, at Lender's option, will: (i) be payable on demand; (ii) be added to the balance of the Loan and be apportioned among and be payable with any installment payments to become due during the remaining term of the Loan; or (iii) be treated as a balloon payment that will be due and payable at the Loan's maturity. Such right shall be in addition to all other rights and remedies to which Lender may be entitled upon an Event of Default as described in Section 29.

**SECTION 19.** **BORROWER'S REPRESENTATIONS AND WARRANTIES.** Borrower represents and warrants that: (i) Borrower will comply with all laws, statutes, regulations and ordinances pertaining to the conduct of Borrower's business and promises to hold Lender harmless from any damages, liabilities, costs, expenses (including attorneys' fees) or other harm arising out of any violation thereof; (ii) Borrower's principal executive office and the office where Borrower keeps its records concerning its accounts, contract rights and other property, is that shown in the application; (iii) Borrower is duly organized, licensed, validly existing and in good standing under the laws of its state of formation and shall hereafter remain in good standing in that state, and is duly qualified, licensed and in good standing in every other

8



state in which it is doing business, and shall hereafter remain duly qualified, licensed and in good standing in every other state in which it is doing business, and shall hereafter remain duly qualified, licensed and in good standing in every other state in which the failure to qualify or become licensed could have a material adverse effect on the financial condition, business or operations of Borrower; (iv) the exact legal name of the Borrower is set forth in the application; (v) the aggregate ownership percentage of the Signatories is greater than or equal to fifty percent (50%) of the Borrower's business; (vi) the execution, delivery and performance of this Agreement, and any other document executed in connection herewith, are within Borrower's powers, have been duly authorized, are not in contravention of law or the terms of Borrower's charter, by-laws or other organization papers, or of any indenture, agreement or undertaking to which Borrower is a party; (vii) all organization papers and all amendments thereto of Borrower have been duly filed and are in proper order and any capital stock issued by Borrower and outstanding was and is properly issued and all books and records of Borrower are accurate and up to date and will be so maintained; (viii) Borrower (a) is subject to no charter, corporate or other legal restriction, or any judgment, award, decree, order, governmental rule or regulation or contractual restriction that could have a material adverse effect on its financial condition, business or prospects, and (b) is in compliance with its organization documents and by-laws, all contractual requirements by which it may be bound and all applicable laws, rules and regulations other than laws, rules or regulations the validity or applicability of which it is contesting in good faith or provisions of any of the foregoing the failure to comply with which cannot reasonably be expected to materially adversely affect its financial condition, business or prospects, the value of the Collateral or the value of the Personal Guaranty; and (ix) there is no action, suit, proceeding or investigation pending or, to Borrower's knowledge, threatened against or affecting it or any of its assets before or by any court or other governmental authority, which, if determined adversely to it, would have a material adverse effect on its financial condition, business or prospects or the value of the Collateral or Personal Guaranty.

**SECTION 20.     INTEREST AND FEES.** Borrower agrees to pay the Interest Charges in full as set forth in the accompanying Business Loan and Security Agreement Supplement. In addition to any other fees described in the Agreement, Borrower agrees to pay the following fees:

A.     Origination Fee: A one-time Origination Fee in the amount set forth in the accompanying Business Loan and Security Agreement Supplement. Borrower agrees that this fee will be immediately deducted from the proceeds of Borrower's Loan.

B.     Returned Payment Fee: A Returned Payment Fee in the amount set forth in the accompanying Business Loan and Security Agreement Supplement if any payment processed on Borrower's Loan is returned unpaid or dishonored for any reason.

Payments made by Borrower will be applied towards Loan interest and principal, interest and fees in the manner set forth in Section 8.

**SECTION 21.     INTEREST AND FEES EXCEEDING PERMITTED LIMIT.** If the Loan is subject to a law that sets maximum charges, and that law is finally interpreted so that the interest or other fees collected or to be collected in connection with this Agreement exceed the permitted limits, then (i) any such charge will be reduced by the amount necessary to reduce the charge to the permitted limit; and (ii) if required by any law, any sums already collected from Borrower that exceed the permitted limits will be refunded or credited to Borrower.

**SECTION 22.     FINANCIAL INFORMATION AND REEVALUATION OF CREDIT.** Borrower and each Guarantor (if any) authorize Lender to obtain business and personal credit bureau reports in Borrower's and any Guarantor's name, respectively, at any time and from time to time for purposes of deciding whether to approve the requested Loan or for any update, renewal, extension of credit or other lawful purpose. Upon Borrower's or any Guarantor's request, Lender will advise Borrower or Guarantor if Lender obtained a credit report and Lender will give Borrower or Guarantor the credit bureau's name and address. Borrower and each Guarantor (if any) agree to submit current financial information, a new credit application, or both, in Borrower's name and in the name of each Guarantor, respectively, at any time promptly upon Lender's request. Borrower authorizes Lender to act as Borrower's agent for purposes of accessing and retrieving transaction history information regarding Borrower from any lender to Borrower, or other entity with which Borrower has a contract for the payment of funds borrowed or advanced. Lender may report Lender's credit experiences with Borrower and any Guarantor of Borrower's Loan to third parties as permitted by law. Borrower also agrees that Lender may release information to comply with governmental reporting or legal process that Lender believes may be required, whether or not such is in fact required, or when necessary or helpful in completing a transaction, or when investigating a loss or potential loss. Borrower and each Guarantor is hereby notified that a negative credit report reflecting on Borrower and/or Guarantor's credit record may be submitted to a credit reporting agency if Borrower or such Guarantor fails to fulfill the terms of their respective credit obligations hereunder.

**SECTION 23.     ATTORNEYS' FEES AND COLLECTION COSTS.** To the extent not prohibited by applicable law, Borrower shall pay to Lender on demand any and all expenses, including, but not limited to, collection costs, all attorneys' fees and expenses, and all other expenses of like or unlike nature which may be expended by Lender to obtain or enforce payment of Obligations either as against Borrower or any Guarantor or surety of Borrower or in the prosecution or defense of any action or concerning any matter growing out of or connected with the subject matter of this Agreement, the Obligations, or the Collateral, or any of Lender's rights or interests therein or thereto, including, without limiting the generality of the foregoing, any counsel fees or expenses incurred in any bankruptcy or insolvency proceedings and all costs and expenses (including search fees) incurred or paid by Lender in connection with the administration, supervision, protection or realization on any security held by Lender for the debt secured hereby, whether such security was granted by Borrower or by any other person primarily or secondarily liable (with or without recourse) with respect to such debt, and all costs and expenses incurred by Lender in connection with the defense, settlement or satisfaction of any action, claim or demand asserted against Lender in connection therewith, which amounts

9

DocuSign Envelope ID: 7C679B27-57A4-48FA-B575-BB78C926A2A3



shall be considered advances to protect Lender's security, and shall be secured hereby. To the extent permitted by applicable law, all such expenses will become a part of the Obligations and, at Lender's option, will: (i) be payable on demand; (ii) be added to the balance of the Loan and be apportioned among and be payable with any installment payments to become due during the remaining term of the Loan; or (iii) be treated as a balloon payment that will be due and payable at the Loan's maturity. Such right shall be in addition to all other rights and remedies to which Lender may be entitled upon an Event of Default.

SECTION 24.      BORROWER'S REPORTS. Promptly upon Lender's written request, Borrower and each Guarantor agree to provide Lender with such information about the financial condition and operations of Borrower or any Guarantor, as Lender may, from time to time, reasonably request. Borrower also agrees promptly upon becoming aware of any Event of Default as described in Section 29, or the occurrence or existence of an event which, with the passage of time or the giving of notice or both, would constitute an Event of Default hereunder, to promptly provide notice thereof to Lender in writing.

SECTION 25.      TELEPHONE COMMUNICATIONS. Borrower hereby expressly consents to receiving calls and messages related to the Loan or this Agreement, including auto-dialed and pre-recorded message calls and SMS messages (including text messages) from Lender, its affiliates, agents and others calling at Lender's request or on its behalf, at any telephone numbers that Borrower has provided or may provide in the future or otherwise in Lender's possession (including any cellular or mobile telephone numbers).

SECTION 26.      INDEMNIFICATION. Except for Lender's gross negligence or willful misconduct, Borrower will indemnify and save Lender harmless from all loss, costs, damage, liability or expenses (including, without limitation, court costs and reasonable attorneys' fees) that Lender may sustain or incur by reason of defending or protecting Lender's security interest or the priority thereof or enforcing the Obligations, or in the prosecution or defense of any action or proceeding concerning any matter growing out of or in connection with this Agreement and/or any other documents now or hereafter executed in connection with this Agreement and/or the Obligations and/or the Collateral. This indemnity shall survive the repayment of the Obligations and the termination of this Agreement.

SECTION 27.      MERGERS, CONSOLIDATIONS OR SALES. Borrower represents and agrees that Borrower will not, without Lender's prior written consent, (i) merge or consolidate with or into any other business entity; or (ii) enter into any joint venture or partnership with any person, firm or corporation.

SECTION 28.      CHANGE IN LEGAL STATUS. Without Lender's prior written consent, Borrower represents and agrees that Borrower will not (i) change its name, its place of business or, if more than one, chief executive office, its mailing address, or organizational identification number if it has one; or (ii) change its type of organization, jurisdiction of organization or other legal structure. If Borrower does not have an organizational identification number and later obtains one, Borrower shall promptly notify Lender of such taxpayer identification number.

SECTION 29.      DEFAULT. The occurrence of any one or more of the following events (herein, "Events of Default") shall constitute, without notice or demand, a default under this Agreement and all other agreements between Lender and Borrower and instruments and papers given Lender by Borrower, whether such agreements, instruments, or papers now exist or hereafter arise: (i) Lender is unable to collect any Automatic Payment Plan payment on [two] consecutive payment due dates, and/or, Borrower fails to pay any Obligations on [two] consecutive payment due dates, and/or Borrower notifies Lender of its intention to terminate the Authorization Agreement for Direct Deposits (ACH Credits) and Direct Payments (ACH Debits), attached to this Business Loan and Security Agreement; (ii) Borrower fails to comply with, promptly, punctually and faithfully perform or observe any term, condition or promise within this Agreement; (iii) the determination by Lender that any representation or warranty heretofore, now or hereafter made by Borrower to Lender, in any documents, instrument, agreement, or paper was not true or accurate when given; (iv) the occurrence of any event such that any indebtedness of Borrower from any lender other than Lender could be accelerated, notwithstanding that such acceleration has not taken place; (v) the occurrence of any event that would cause a lien creditor, as that term is defined in Section 70A-9a-102 of the Utah Uniform Commercial Code, (other than Lender) to take priority over the Loan made by Lender; (vi) a filing against or relating to Borrower (unless consented to in writing by Lender) of (a) a federal tax lien in favor of the United States of America or any political subdivision of the United States of America, or (b) a state tax lien in favor of any state of the United States of America or any political subdivision of any such state; (vii) the occurrence of any event of default under any other agreement between Lender and Borrower or instrument or paper given Lender by Borrower, whether such agreement, instrument, or paper now exists or hereafter arises (notwithstanding that Lender may not have exercised its rights upon default under any such other agreement, instrument or paper); (viii) any act by, against, or relating to Borrower, or its property or assets, which act constitutes the application for, consent to, or sufferance of the appointment of a receiver, trustee or other person, pursuant to court action or otherwise, over all, or any part of Borrower's property; (ix) the granting of any trust, mortgage or execution of an assignment for the benefit of the creditors of Borrower, or the occurrence of any other voluntary or involuntary liquidation or extension of debt agreement for Borrower; (x) the failure by Borrower to generally pay the debts of Borrower as they mature; (xi) adjudication of bankruptcy or insolvency relative to Borrower; (xii) the entry of an order for relief or similar order with respect to Borrower in any proceeding pursuant to Title 11 of the United States Code entitled "Bankruptcy" (the "Bankruptcy Code") or any other federal bankruptcy law; (xiii) the filing of any complaint, application or petition by or against Borrower initiating any matter in which Borrower is or may be granted any relief from the debts of Borrower pursuant to the Bankruptcy Code or any other insolvency statute or procedure; (xiv) the calling or sufferance of a meeting of creditors of Borrower; (xv) the meeting by Borrower with a formal or informal creditors committee; (xvi) the offering by or entering into by Borrower of any composition, extension or any other arrangement seeking relief or extension for the debts of Borrower, or the initiation of any other judicial or non-judicial proceeding or agreement by, against or including Borrower that

US_140305676v2_391927-00001 7/16/2019 9:39 PM



seeks or intends to accomplish a reorganization or arrangement with creditors; (xvii) the entry of any judgment against Borrower, which judgment is not satisfied or appealed from (with execution or similar process stayed) within 15 days of its entry; (xviii) the occurrence of any event or circumstance with respect to Borrower such that Lender shall believe in good faith that the prospect of payment of all or any part of the Obligations or the performance by Borrower under this Agreement or any other agreement between Lender and Borrower is impaired or there shall occur any material adverse change in the business or financial condition of Borrower (such event specifically includes, but is not limited to, taking additional financing from a third party funder in connection with a merchant cash advance or a working capital loan, in respect of which either daily or weekly payments are made, without the prior written consent of Lender); (xix) the entry of any court order that enjoins, restrains or in any way prevents Borrower from conducting all or any part of its business affairs in the ordinary course of business; (xx) the occurrence of any uninsured loss, theft, damage or destruction to any material asset(s) of Borrower; (xxi) any act by or against, or relating to Borrower or its assets pursuant to which any creditor of Borrower seeks to reclaim or repossess or reclaims or repossesses all or a portion of Borrower's assets; (xxii) the termination of existence, dissolution or liquidation of Borrower or the ceasing to carry on actively any substantial part of Borrower's current business; (xxiii) this Agreement shall, at any time after its execution and delivery and for any reason, cease to be in full force and effect or shall be declared null and void, or the validity or enforceability hereof shall be contested by Borrower or any Guarantor of Borrower denies it has any further liability or obligation hereunder; (xxiv) any Guarantor or person signing a support agreement in favor of Lender shall repudiate, purport to revoke or fail to perform his or her obligations under his Guaranty or support agreement in favor of Lender or any corporate Guarantor shall cease to exist; (xxv) any material change occurs in Borrower's ownership or organizational structure (acknowledging that any change in ownership will be deemed material when ownership is closely held); (xxvi) if Borrower is a trust, a trustor dies; if Borrower is a partnership, any general or managing partner dies; if Borrower is a corporation, any principal officer or 10% or greater shareholder dies; if Borrower is a limited liability company, any managing member dies; if Borrower is any other form of business entity, any person(s) directly or indirectly controlling 10% or more of the ownership interests of such entity dies; or (xxvii) any Guarantor dies.

**SECTION 30.**     **DEFAULT RATE OF INTEREST.** To the extent permitted under applicable law, if any amount payable under this Agreement is not paid when due (without regard to any applicable grace periods), whether at the stated maturity, by acceleration or otherwise, in full on the due date for such payment, or upon acceleration of this Agreement, the then outstanding Loan Amount of this Agreement shall bear interest at the Simple Interest Rate on Total Funding Amount set forth in the Business Loan and Security Agreement Supplement (the "Default Rate") from the date payment was due until such delinquent payment is paid in full to Lender. If the Default Rate is triggered as a result of an Event of Default and Borrower subsequently cures the Event of Default, then all amounts owing hereunder to Lender after such cure will resume bearing interest at the Simple Interest Rate for New Funding Amount rather than at the Default Rate, on the date the Event of Default is cured; provided, however, that the amount owing hereunder may again accrue interest at the Default Rate upon the occurrence of a subsequent Event of Default. This provision shall not imply that Borrower may cure any default or Event of Default or reinstate the Loan after an Event of Default other than as expressly permitted under the terms of this Agreement, nor shall this provision imply that Borrower has a right to delay or extend the dates upon which payments are due under this Agreement. Borrower acknowledges that it would be extremely difficult or impracticable to determine Lender's actual damages resulting from any late payment or default, and such interest at the Default Rate is a reasonable estimate of those damages and does not constitute a penalty. The remedies of Lender in this Agreement, or at law or in equity, shall be cumulative and concurrent, and may be pursued individually, successively, or together in Lender's discretion.

**SECTION 31.**     **RIGHTS AND REMEDIES UPON DEFAULT.** Subject to applicable law, if an Event of Default as described in Section 29 occurs under this Agreement, at any time thereafter, Lender may exercise any one or more of the following rights and remedies:

i.     Refrain from Disbursing Loan Proceeds: Lender may refrain from disbursing Borrower's Loan proceeds or any other amounts which may be due to the Borrower, to Borrower's Designated Checking Account, in respect of this or any future Loan concluded between Borrower and Lender.

ii.     Debit Amounts Due From Borrower's Accounts: Lender may debit from Borrower's Designated Checking Account all Automatic Payment Plan payments that Lender was unable to collect and/or the amount of any other Obligations that Borrower failed to pay, including any "Accelerated Indebtedness as defined below.

iii.     Accelerate Indebtedness: Lender may declare the entire Obligations immediately due and payable, without notice of any kind to Borrower.

iv.     Assemble Collateral: Lender may require Borrower and/or Guarantor to deliver to Lender all or any portion of the Collateral and any and all certificates of title and other documents relating to the Collateral. Lender may require Borrower and/or Guarantor to assemble the Collateral and make it available to Lender at a place to be designated by Lender. Lender also shall have full power to enter, provided Lender does so without a breach of the peace or a trespass, upon the property of Borrower and/or Guarantor to take possession of and remove the Collateral. If the Collateral contains other goods not covered by this Agreement at the time of repossession, Borrower and Guarantor agree Lender may take such other goods, provided that Lender makes reasonable efforts to return them to Borrower and Guarantor after repossession.

v.     Sell the Collateral: Lender shall have full power to sell, lease, transfer, or otherwise deal with the Collateral or proceeds thereof in Lender's own name or that of Borrower and/or Guarantor. Lender may sell the Collateral at public auction or private sale. Unless the Collateral threatens to decline speedily in value or is of a type customarily sold on a recognized market, Lender will give Borrower, Guarantor and other persons as required by law, reasonable notice of the time and place of any public sale, or the time after which any private sale or any other disposition of the Collateral is to be made. However, no notice need be provided to any person who, after an Event of Default occurs, enters into and

US_140305676v2_391927-00001 7/16/2019 9:39 PM



authenticates an agreement waiving that person's right to notification of sale. The requirements of reasonable notice shall be met if such notice is given at least 10 days before the time of the sale or disposition. All expenses relating to the disposition of the Collateral, including without limitation the expenses of retaking, holding, insuring, preparing for sale and selling the Collateral, shall become a part of the Obligations secured by this Agreement. To the extent permitted by applicable law, all such expenses will become a part of the Obligations and, at Lender's option, will: (i) be payable on demand; (ii) be added to the balance of the Loan and be apportioned among and be payable with any installment payments to become due during either (a) the term of any applicable insurance policy or (b) the remaining term of the Loan; or (iii) be treated as a balloon payment that will be due and payable at the Loan's maturity.

vi.    Appoint Receiver: Lender shall have the right to have a receiver appointed to take possession of all or any part of the Collateral, with the power to protect and preserve the Collateral, to operate the Collateral preceding foreclosure or sale, and to collect the rents from the Collateral and apply the proceeds, over and above the cost of the receivership, against the Obligations. The receiver may serve without bond if permitted by law. Lender's right to the appointment of a receiver shall exist whether or not the apparent value of the Collateral exceeds the Obligations by a substantial amount. Employment by Lender shall not disqualify a person from serving as a receiver.

vii.   Collect Revenues, Apply Accounts: Lender, either itself or through a receiver, may collect the payments, rents, income, and revenues from the Collateral. Lender may at any time in Lender's discretion transfer any Collateral into Lender's own name or that of Lender's nominee and receive the payments, rents, income and revenues therefrom and hold the same as security for the Obligations or apply it to payment of the Obligations in such order of preference as Lender may determine. Insofar as the Collateral consists of accounts, general intangibles, insurance policies, instruments, chattel paper, choses in action, or similar property, Lender may demand, collect, receipt for, settle, compromise, adjust, sue for, foreclose or realize on the Collateral as Lender may determine, whether or not any amount included within the Obligations is then due. For these purposes, Lender may, on behalf of and in the name of Borrower and/or Guarantor, receive, open and dispose of mail addressed to Borrower; change any address to which mail and payments are to be sent; and endorse notes, checks, drafts, money orders, documents of title, instruments and items pertaining to payment, shipment or storage of any Collateral. To facilitate collections, Lender may notify account debtors and obligors on any Collateral to make payments directly to Lender.

viii.  Obtain Deficiency: If Lender chooses to sell any or all of the Collateral, Lender may obtain a judgment against Borrower and/or Guarantor for any deficiency remaining on the Obligations due to Lender after application of all amounts received from the exercise of the rights provided in this Agreement. Borrower and/or Guarantor shall be liable for a deficiency even if the transaction described in this subsection is a sale of accounts or chattel paper.

ix.    Other Rights and Remedies: Lender shall have all the rights and remedies of a secured creditor under the provisions of the Utah Uniform Commercial Code, as may be amended from time to time. In addition, Lender shall have and may exercise any or all other rights and remedies it may have available at law, in equity or otherwise.

x.     Setoff. In addition to any rights and remedies of the Lender provided by law, if Borrower is in default, Lender is authorized at any time and form time to time, without prior notice to Borrower, any such notice being waived by the Borrower to the fullest extent permitted by law, to set off and apply any and all deposits (general or special, time or demand, provisional or final) at any time held by, and other indebtedness at any time owing to, the Lender to or for the credit or the account of the Borrower against any and all obligations owing to the Lender, now or hereafter existing, irrespective of whether such obligations may be contingent or unmatured.  The Lender agrees promptly to notify the Borrower after any such setoff and application made by the Lender; provided, however, that the failure to give such notice shall not affect the validity of such setoff and application.

xi.    Election of Remedies: Except as may be prohibited by applicable law, all of Lender's rights and remedies, whether evidenced by this Agreement, any related documents, or by any other writing, shall be cumulative and may be exercised singularly or concurrently. Election by Lender to pursue any remedy shall not exclude pursuit of any other remedy, and an election to make expenditures or to take action to perform an obligation of Borrower under the Agreement, after Borrowers failure to perform, shall not affect Lender's right to declare a default and exercise its remedies.

SECTION 32.    CONSENT TO JURISDICTION AND VENUE. Subject to Section 33 below, Borrower, each Guarantor and Lender agree that any action or proceeding to enforce or arising out of this Agreement may be brought in any court of the State of Utah or in the United States District Court for the District of Utah, and Borrower and each Guarantor waives personal service of process. Borrower, each Guarantor and Lender agree that venue is proper in such courts.

SECTION 33.    ARBITRATION/CLASS ACTION WAIVER. To the extent that a claim or dispute arises out of, or in relation to this Agreement, including without limitation, the terms, construction, interpretation, performance, termination, breach, or enforceability of this Agreement, the parties hereby agree that the claim or dispute shall be, at the election of either party, resolved by mandatory binding arbitration in Utah within a reasonable time period not to exceed ninety (90) days. The parties agree that the arbitration shall be administered by JAMS and the arbitration shall be conducted in accordance with the Expedited Procedures of the JAMS Comprehensive Arbitration Rules and Procedures except as otherwise agreed in this Agreement. The arbitrator shall be chosen in accordance with the procedures of JAMS, and shall base the award on applicable Utah law. Judgment on the award may be entered in any court having jurisdiction, subject to Section 32 above. The parties further agree that the costs of the arbitration shall be divided equally between them, except that Lender will consider in good



faith a request by Borrower to pay the costs of arbitration. **Each party may pursue arbitration solely in an individual capacity, and not as a representative or class member in any purported class or representative proceeding. The arbitrator may not consolidate more than one person's or entity's claims, and may not otherwise preside over any form of a representative or class proceeding. This arbitration section is governed by the Federal Arbitration Act, 9 U.S.C. §§ 1-16.**

**SECTION 34.** **NO WAIVER BY LENDER.** No delay or omission on the part of Lender in exercising any rights under this Agreement, any related guaranty or applicable law shall operate as a waiver of such right or any other right. Waiver on any one occasion shall not be construed as a bar to or waiver of any right or remedy on any future occasion. All Lender's rights and remedies, whether evidenced hereby or by any other agreement, instrument or paper, shall be cumulative and may be exercised singularly or concurrently. No waiver by Lender of any of its rights or of any such breach, default, or failure of condition shall be effective, unless the waiver is expressly stated in a writing signed by Lender.

**SECTION 35.** **ASSIGNMENT.** This Agreement shall bind and inure to the benefit of the respective successors and assigns of each of the parties hereto; provided, however, that Borrower may not assign this Agreement or any rights or duties hereunder without Lender's prior written consent and any prohibited assignment shall be absolutely null and void. No consent to an assignment by Lender shall release Borrower from its obligations. Lender may assign this Agreement and its rights and duties hereunder and no consent or approval by Borrower is required in connection with any such assignment. Lender reserves the right to sell, assign, transfer, negotiate or grant participations in all or any part of, or any interest in Lender's rights and benefits hereunder. In connection with any assignment or participation, Lender may disclose all documents and information that Lender now or hereafter may have relating to Borrower or Borrower's business. To the extent that Lender assigns its rights and obligations hereunder to another party, Lender thereafter shall be released from such assigned obligations to Borrower and such assignment shall affect a novation between Borrower and such other party.

**SECTION 36.** **INTERPRETATION.** Paragraph and section headings used in this Agreement are for convenience only, and shall not affect the construction of this Agreement. Neither this Agreement nor any uncertainty or ambiguity herein shall be construed or resolved against Lender or Borrower, whether under any rule of construction or otherwise. On the contrary, this Agreement has been reviewed by all parties and shall be construed and interpreted according to the ordinary meaning of the words used so as to fairly accomplish the purposes and intentions of all parties hereto. Borrower has obtained the advice of counsel prior to executing this Agreement.

**SECTION 37.** **SEVERABILITY.** If one or more provisions of this Agreement (or the application thereof) is determined invalid, illegal or unenforceable in any respect in any jurisdiction, the same shall not invalidate or render illegal or unenforceable such provision (or its application) in any other jurisdiction or any other provision of this Agreement (or its application).

**SECTION 38.** **NOTICES.** Except as otherwise provided in this Agreement, notice under this Agreement must be in writing. Notices will be deemed given when deposited in the U.S. mail, postage prepaid, and first class mail; when delivered in person; or when sent by registered mail; by certified mail; or by nationally recognized overnight courier; or when sent by electronic mail. Notice to Borrower will be sent to Borrower's last known address or electronic mail address in Lender's records for this Loan. Notice to Lender may be sent to: **Mulligan Funding LLC, 4715 Viewridge Ave, San Diego, CA 92123 – Att: Accounting Dept.** Borrower agrees to notify Lender immediately if Borrower changes Borrower's name, Borrower's postal or electronic mail address or other contact information, if there are any errors in the information regarding transactions on Borrower's account provided by Borrower to Lender, or any of Borrower or Guarantor(s) dies, is declared incompetent or is subject of a bankruptcy or insolvency proceeding. Borrower and Guarantor(s) agree that a notice of incompetence is not effective unless issued by a court having jurisdiction, and Lender receives notice and instruction from the Court. Notwithstanding the above, Lender may, at Lender's option, accept other evidence of incompetence acceptable to Lender. Borrower and Guarantor(s) agree to indemnify and hold Lender harmless from and against any and all claims relating to the acceptance or non-acceptance of proof of incompetence in any transaction. This indemnity will survive termination of this Agreement.

**SECTION 39.** **RECORDKEEPING AND AUDIT REQUIREMENTS.** Lender shall have no obligation to maintain any electronic records or any documents, schedules, invoices or any other paper delivered to Lender by Borrower in connection with this Agreement or any other agreement other than as required by law. Borrower will at all times keep accurate and complete records of Borrower's accounts and Collateral. At Lender's request, Borrower shall deliver to Lender (i) schedules of accounts and general intangibles; and (ii) such other information regarding the Collateral and Loan as Lender shall request. Lender, or any of its agents, shall have the right to call any telephone numbers that Borrower has provided or may provide in the future or otherwise in the Lender's possession (including any cellular or mobile telephone number) at intervals to be determined by Lender, and without hindrance or delay, to inspect, audit, check, and make extracts from any copies of the books, records, journals, orders, receipts, correspondence that relate to Borrower's accounts, Collateral, or other transactions between the parties thereto and the general financial condition of Borrower and Lender may remove any of such records temporarily for the purpose of having copies made thereof. If Borrower was referred to Lender for this Loan by a third party (the "Referring Party"), then Borrower consents to Lender sharing certain reasonable information about Borrower with the Referring Party for purposes of the Referring Party verifying and/or auditing loans made through such Referring Party's referrals.

**SECTION 40.** **GOVERNING LAW.** Subject to Section 33 above, our relationship including this Agreement and any claim, dispute or controversy (whether in contract, tort, or otherwise) at any time arising from or relating to this Agreement is governed by, and this Agreement will be construed in accordance with, applicable federal law and (to the extent not preempted by federal law) Utah law without

13



regard to internal principles of conflict of laws. The legality, enforceability and interpretation of this Agreement and the amounts contracted for, charged and reserved under this Agreement will be governed by such laws. Borrower understands and agrees that (i) Lender is located in Utah; (ii) Lender makes all credit decisions from Lender's office in Utah; (iii) the Loan is made in Utah (that is, no binding contract will be formed until Lender receives and accepts Borrower's signed Agreement in, and disburses the Loan Disbursement Amount from, Utah); and (iv) Borrower's payments are not accepted until received by Lender.

SECTION 41. WAIVER OF NOTICES AND OTHER TERMS. Except for any notices provided for in this Agreement, Borrower and any person who has obligations pursuant to this Agreement (e.g., a Guarantor), to the extent not prohibited by applicable law hereby, waives demand, notice of nonpayment, notice of intention to accelerate, notice of acceleration, presentment, protest, notice of dishonor and notice of protest. To the extent permitted by applicable law, Borrower and any person who has obligations pursuant to this Agreement also agrees: Lender is not required to file suit, show diligence in collection against Borrower or any person who has obligations pursuant to this Agreement, or proceed against any Collateral. Lender may, but will not be obligated to, substitute, exchange or release any Collateral; Lender may release any Collateral, or fail to realize upon or perfect Lender's security interest in any Collateral; Lender may, but will not be obligated to, sue one or more persons without joining or suing others; and Lender may modify, renew, or extend this Agreement (repeatedly and for any length of time) without notice to or approval by any person who has obligations pursuant to this Agreement (other than the party with whom the modification, renewal or extension is made).

SECTION 42. MONITORING, RECORDING AND ELECTRONIC COMMUNICATIONS. In order to ensure a high quality of service for Lender's customers, Lender may monitor and/or record telephone calls between Borrower and Lender's employees or agents. Borrower acknowledges that Lender may do so and agrees in advance to any such monitoring or recording of telephone calls. Borrower also agrees that Lender may communicate with Borrower electronically by e-mail.

SECTION 43. JURY TRIAL WAIVER. To the extent not prohibited by applicable law and to the extent Section 33 is not operative, Borrower and each Guarantor knowingly, intentionally, and voluntarily, with and upon the advice of competent counsel, and Lender by its acceptance hereof, waive their right to a trial by jury of any claim or cause of action based upon, arising out of or related to the Agreement and all other documentation evidencing the obligations, in any legal action or proceeding. Any such claim or cause of action shall be tried by court sitting without a jury.

SECTION 44. CONFIDENTIALITY. Borrower shall not make, publish or otherwise disseminate in any manner a copy of this Agreement or any public statement or description of the terms of this Agreement, except to its employees, advisors and similar persons who have a legitimate need to know its contents.

SECTION 45. ENTIRE AGREEMENT. Any application Borrower signed or otherwise submitted in connection with the Loan, the accompanying Business Loan and Security Agreement Supplement and the Authorization Agreement for Direct Deposit (ACH Credit) and Direct Payments (ACH Debits) and any other documents required by Lender now or in the future in connection with this Agreement and Borrower's Loan are hereby incorporated into and made a part of this Agreement. This Agreement is the entire agreement of the parties with respect to the subject matter hereof and supersedes any prior written or verbal communications or instruments relating thereto.

SECTION 46. COUNTERPARTS; ELECTRONIC OR FAX SIGNATURES. This Agreement may be executed in one or more counterparts, each of which counterparts shall be deemed to be an original, and all such counterparts shall constitute one and the same instrument. For purposes of the execution of this Agreement, facsimile signatures delivered by electronic or fax submission shall be treated in all respects as original signatures.

SECTION 47. CUSTOMER SERVICE CONTACT INFORMATION. If you have questions or comments about your Loan, you may contact us by (i) e-mail at **customerservice@mulliganfunding.com**, (ii) telephone at **844-437-3863**.

SECTION 48. PERSONAL GUARANTY. The undersigned (each a "Guarantor"), jointly and severally (if more than one), absolutely and unconditionally guarantee the prompt payment to Lender, including its successors and assignees, of any and all Obligations incurred by the Borrower pursuant to the Agreement (this "Personal Guaranty"). Each Guarantor further agrees to repay the Obligations on demand, without requiring Lender first to enforce payment against Borrower, or against any other Guarantor, if applicable. This is a guarantee of payment and not of collection. This is an absolute, unconditional, primary, and continuing obligation and will remain in full force and effect until the first to occur of the following: (a) all of the Obligations have been indefeasibly paid in full, and Lender has terminated this Personal Guaranty, or (b) 30 days after the date on which written notice of revocation is actually received and accepted by Lender. No revocation will affect: (i) the then existing liabilities of the revoking Guarantor under this Personal Guaranty; (ii) Obligations created, contracted, assumed, acquired or incurred prior to the effective date of such revocation; (iii) Obligations created, contracted, assumed, acquired or incurred after the effective date of such revocation pursuant to any agreement entered into or commitment obtained prior to the effective date of such revocation; or (iv) any Obligations then or thereafter arising under the agreements or instruments then in effect and then evidencing the Obligations. Each Guarantor represents and warrants that it is a legal resident of the United States of America. Each Guarantor waives all notices to which the Guarantor might otherwise be entitled by law, and also waives all defenses, legal or equitable, otherwise available to the Guarantor. This Personal Guaranty shall be construed in accordance with the laws of the State of Utah, and shall inure to the benefit of Lender, its successors

US_140305676v2_391927-00001 7/16/2019 9:39 PM



and assigns. To the extent not prohibited by applicable law, each of the undersigned Guarantors affirmatively agree to be subject to Section 33, and Section 43 of this Agreement ("Consent to Jurisdiction and Venue", "Arbitration/Class Action Waiver", and "Jury Trial Waiver" respectively).

    **SECTION 49.**   **CERTIFICATION AND SIGNATURES**. By signing above and/or below or authorizing the person signing below to sign on its behalf, Borrower certifies that Borrower has received a copy of this Agreement; the accompanying Business Loan and Security Agreement Supplement; and the Authorization Agreement for Direct Deposit (ACH Credit) and Direct Payments (ACH Debits), and that Borrower has read, understood and agreed to be bound by their terms. Each person signing below certifies that each person is signing on behalf of the Borrower in the capacity indicated below the signer's name and that such signer is authorized to execute this Agreement on behalf of or the in stated relation to Borrower.

Use of Proceeds Certification

As referred to in Section, by signing below, the Borrower certifies, acknowledges and understands that the proceeds from the requested Loan will be used solely for commercial and business purposes; and that the proceeds will not be used for personal, family or household purposes.

[Signature page follows]

---

## NOTICE TO GUARANTOR

**You are being asked to guarantee the past, present, and future Obligations of Borrower. If Borrower does not pay, you will have to. You may also have to pay collection costs. Lender can collect the Obligations from you without first trying to collect from Borrower or another Guarantor or proceeding against any other Collateral or other security for the Obligations.**

---

US_140305676v2_391927-00001 7/16/2019 9:39 PM



**Guarantor #1:** _Christopher Broussard_    **Borrower #1:** _Christopher Broussard_
           (Signature)                     (Signature)

**Christopher Broussard**      **Apex Services Group LLC dba - Apex Services Group**

Date:_ 1/28/2021 _      Title:_ Managing Partner _

                         Date:_ 1/28/2021 _

**Guarantor #2:**_____
       (Signature)

Date:_____

**Guarantor #3:**_____
       (Signature)

Date:_____

Note: This Signature Page must be signed and dated before a loan can be funded.

US_140305676v2_391927-00001 7/16/2019 9:39 PM

DocuSign Envelope ID: 7C679B27-57A4-48FA-B575-BB78C926A2A3



## CERTIFICATION OF BENEFICIAL OWNER(S)

Please verify the following information for

1. Any individual(s), who, directly or indirectly, through any contract, arrangement, understanding, relationship, or otherwise **owns 25% or more** of the equity interests of the legal entity also listed below; **AND**
2. An individual with significant responsibility for managing or directing the business (e.g., CEO, President COO, Managing Member, etc)

If any of the information provided is inaccurate or incomplete, please contact Mulligan Funding at docs@mulliganfunding.com or 844-437-3863 to update.

For more information on Beneficial Ownership Certification, visit the following page: http://www.mulliganfunding.com/docs/beneficial-ownership/

I, **Christopher Broussard**, am opening a loan account with Mulligan Funding on behalf of the legal entity listed below:

### LEGAL ENTITY

| Name of Legal Entity | | Corporate Structure | |
|---|---|---|---|
| **Apex Services Group LLC** | | **Limited Liability Company (LLC)** | |
| Address | City | State | Zip |
| 17601 Interstate 35 Access Road | Lytle | TX | 78052 |

### BENEFICIAL OWNER(S)

| Last Name | First Name | M.I. | Date of Birth |
|---|---|---|---|
| **Broussard** | **Christopher** | | |
| Address | City | State | Zip |
| 17601 Interstate 35 Access Road | Lytle | TX | 78052 |
| Country | | SSN (U.S. Persons) | |



| For Non-U.S. persons (SSN, Passport Number or other similar identification number)* | Country of issuance: |
|---|---|
| | |

## INDIVIDUAL RESPONSIBLE FOR MANAGING OR DIRECTING THE BUSINESS

| Last Name | First Name | M.I. | Date of Birth |
|---|---|---|---|
| Broussard | Christopher | | |

| Address | City | State | Zip |
|---|---|---|---|
| 17601 Interstate 35 Access Road | Lytle | TX | 78052 |

| Country | | SSN (U.S. Persons) | |
|---|---|---|---|
| | | | |

| For Non-U.S. persons (SSN, Passport Number or other similar identification number)* | | Country of issuance: | |
|---|---|---|---|
| | | | |

*Note: In lieu of a passport number, Non-U.S. Persons may also provide a Social Security Number, an alien identification card number, or number and country of issuance of any other government-issued document evidencing nationality or residence and bearing a photograph or similar safeguard.

I, **Christopher Broussard** , hereby certify, to the best of my knowledge, that the information provided above is complete and correct and that I will promptly notify Mulligan Funding of any changes to this information.

DocuSign Envelope ID: 7C679B27-57A4-48FA-B575-BB78C926A2A3

**Mulligan Funding**

1/28/2021

Signature: _____ Christopher Broussard _____     Date: _____

545D7B2B20CB419

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**Exhibit 3**

BROUSSARD V. MULLIGAN: COMPLAINT FOR FRAUD;USURY; UNCONSCIONABLITIY; NEGLIGENCE PER SE – VIOLATION OF TEXAS
FINANCE CODE; UNJUST ENRIGHMENT/ DISGORGEMENT; INJUNCTION AND DECLARATORY RELIEF



## BUSINESS LOAN AND SECURITY AGREEMENT
## SUPPLEMENT

This Business Loan and Security Agreement Supplement is part of (and incorporated by reference into) the Business Loan and Security Agreement. Borrower should keep this important legal document for Borrower's records.

| | |
|---|---|
| **Borrower:** | **Apex Services Group LLC dba - Apex Services Group** |
| **Lender:** | **FinWise Bank** |
| **Existing Balance to be Paid Off:**<br><br>Amount of Existing Balance owed to any third party lender or provider of funding, which will be paid as of the Effective Date of this Loan Agreement and will be deducted from your Disbursement Amount | **$0.00** |
| **Existing Balance to be Consolidated:**<br><br>Amount of Existing Balance owed to Lender in respect of an existing loan, which Existing Balance WILL NOT be paid off, but will be Consolidated with the New Funding Amount as of the Effective Date of this Loan Agreement as set forth in the Total Funding Amount | **$74,083.15** |
| **New Funding Amount:** | **$55,000.00** |
| **Total Funding Amount:**<br><br>The sum of the Existing Consolidated Balance (if any) and the New Funding Amount | **$129,083.15** |
| **Origination Fee** | **$0.00** |
| **Interest Charge in respect of the New Funding Amount:**<br><br>Dollar amount of interest that the New Funding Amount will cost (does not include any Fees) | **$14,850.00** |
| **Interest Charge in respect of the Existing Consolidated Balance:**<br><br>Dollar amount of interest that will be charged for the consolidation of any Existing Consolidated Balance with the New Funding Amount (if applicable) | **$8,334.35** |
| **Total Repayment Amount:**<br><br>Sum of Total Funding Amount, Interest Charge in Respect of the New Funding Amount, and Interest Charge in Respect of the Existing Consolidated Balance (if any), when all payments are made on time | **$152,267.50** |
| **Payment Schedule and Term:** | 50.4 payments of **$ 3,021.20** due each **Business Week** beginning on the first business day after the Disbursement Amount is disbursed. (collectively, the **Weekly Repayment Amount**")<br><br>*"Business day" means any Monday through Friday, except for Federal Reserve holidays, and "Business Week" has a corresponding meaning.* |
| **Disbursement Amount:**<br><br>New Funding Amount less the Existing Paid Off Balance (if any), less the Origination Fee | **$55,000.00** |
| **Simple Interest Rate on New Funding Amount:**<br><br>(Interest rate paid on Amount of Loan if all payments made as scheduled. This Interest Rate is <u>not</u> an annualized interest rate) | **27.0%** |
| **Fees:** | Returned Payment Fee: **$25.00** |

1



| **Prepayment Discount Percentage:** | A "Prepayment Discount Percentage" of 6% of the full balance then remaining on the Loan will apply with respect to this Loan to the extent that the Borrower prepays this Loan in whole in accordance with, and subject to, Section 10 of the Business Loan and Security Agreement. |
| --- | --- |

## Interest Rate

The simple interest rate disclosed on this Business Loan and Security Agreement Supplement (the "Interest Rate") is the rate of interest calculated by dividing the Amount of the New Funding Amount by the Interest Charge in respect of the New Funding Amount. This calculation assumes that all payments are made as scheduled. **THIS SIMPLE INTEREST RATE DOES NOT INCLUDE ANY FEES AND IS NOT ANNUALIZED AND, THEREFORE, IS NOT AN ANNUAL PERCENTAGE RATE ("APR")**.

The APR equals a single percentage number that represents the actual yearly cost of funds over the term of a loan and includes any fees or additional costs associated with the loan. The APR on this loan can be compared to the APR of other loan programs to give you a consistent means of comparing rates and programs to the extent programs have different loan terms and fee structures.

Attached to this Business Loan and Security Agreement Supplement is **SMART Box™ Capital Comparison Tool**, which is provided to help you understand and assess the cost of your small business financing in a variety of different ways, in order to assist that understanding as fully as possible.

## Loan Pricing Disclosure

Lender uses a system of risk-based pricing to determine Loan amounts, interest charges and fees. Risk-based pricing is a system that evaluates the risk factors of your application and adjusts the amount of the Loan, its term and the interest rate and discounts points up or down based on this risk evaluation.

Although Lender believes that its loan process provides expedited turnaround time and its underwriting process provides greater likelihood of approval of your loan, this loan may be a higher cost loan than loans that may be available through other lenders. You should fully consider all costs and fees associated with this loan and compare your available alternatives to this loan. You are encouraged to engage appropriate advisors to the extent you believe necessary to evaluate the terms of this loan.

## ELECTRONIC SIGNATURE

Borrower and each Guarantor (as defined in the Business Loan and Security Agreement below) agree that any electronic signature provided to Lender in connection with the Business Loan and Security Agreement Supplement, the Business Loan and Security Agreement,, the Authorization Agreement for Direct Deposit (ACH Credit) and Direct Payments (ACH Debits), and any other agreement between the parties related to the subject matter contained therein shall have the same force and effect as a manual signature. As used herein, the term "**electronic signature**" means any electronic sound, symbol or process attached to or logically associated with a record and executed and adopted by a person or entity with the intent to sign such record on behalf of Borrower or Guarantor (as applicable).

## LOAN FOR SPECIFIC PURPOSES ONLY

The proceeds of the requested Loan may solely be used for the specific purposes as set forth in the Use of Proceeds Certification of the Business Loan and Security Agreement. **IN ADDITION, THE LOAN WILL NOT BE USED FOR PERSONAL, FAMILY OR HOUSEHOLD PURPOSES**. Borrower understands that Borrower's agreement not to use the Loan proceeds for personal, family or household purposes means that certain important duties imposed upon entities making loans for consumer/personal purposes, and certain important rights conferred upon consumers, pursuant to Federal or State law will not apply to this transaction.

## CERTIFICATION RELATED TO BORROWER'S OWNERSHIP

If Borrower has an Existing Consolidated Balance owed to the Lender or Existing Paid Off Balance owed to a third party (each as defined above), by signing below, Borrower certifies and confirms that there have been no changes to its beneficial ownership since the initial funding related to the Existing Balance in question.

**Please sign this document here:**

DocuSigned by:

*Christopher Broussard*

**Christopher Broussard**

545D7B2B20CB419...

DocuSign Envelope ID: A587C5A5-7FC8-4D86-A5F4-33D3D86A8659



Mulligan Funding

| Borrower: Apex Services Group LLC | | | Lender: FinWise Bank | |
|---|---|---|---|---|
| **SMARTBOX**™  Capital Comparison Tool | | The SMART Box™ is provided to help you understand and assess the cost of your small business financing. The calculations below involve certain key assumptions, including that the Loan is paid off in its entirety according to the agreed payment schedule and that no repayments are missed. | | |
| **Loan Amount**  **$ 129,083.15** | **Disbursement Amount** [1]  **$ 129,083.15** | | **Total Repayment Amount**  **$ 152,267.50** | **Term**  **12.0 Months**  (repaid Weekly) |
| **METRIC** | **METRIC CALCULATION** | | **METRIC EXPLANATION** | |
| **Total Cost of Credit**  **$ 23,184.35** | Interest Expense/ Loan Fee:  Origination Fee:  Other Fees:  **Total Cost of Credit:** | **$ 23,184.35**  **$ 0.00**  **$0.00**  **$ 23,184.35** | This is the total amount that you will pay in Interest Expense/Loan Fees and other fees.  The amount does not include fees and other charges you can avoid, such as late payment fees and returned payment fees.[2] | |
| **Annual Percentage Rate (APR)** [3]  **33.43 %** | Your Loan will have **50.4** **Weekly** payments of:  **APR:** | **$ 3,021.20**  **33.43 %** | This is the cost of the Loan – including total Interest Expense/Loan Fees and other fees – expressed as an annual rate. APR takes into account the amount and timing of funding you receive, fees you pay, and the periodic payments you make.  While APR can be used for comparison purposes, APR is not used to calculate your Interest Expense/Loan Fees. APR may not equal the interest rate applied to a Loan.[4] | |
| **Average Monthly Payment**  **$ 12,688.96** | Total Repayment Amount:  Term (in months):  **Average Monthly Payment:** | **$ 152,267.50**  **÷ 12.0 Months**  **$ 12,688.96** | This is the average monthly repayment amount, which does not include fees and other charges you can avoid, such as late payment fees and returned payment fees.[2]  The actual repayment frequency for the Loan will be [daily/weekly]. This is an estimate for comparison purposes only. | |
| **Cents on Dollar**  **$ 0.180** | Total Cost of Credit  Loan Amount:  **Cents on Dollar:** | **$ 23,184.35**  **÷ $ 129,083.15**  **$ 0.180** | This is the total amount that you will pay in Interest Expense/Loan Fees and other fees per dollar borrowed. | |
| **Security Interest and Collateral Requirements** | Is this Loan secured? | | **Yes**  *(See Section 11)* | |
| | Is this Loan Collateralized? | | **No** | |
| **Personal Guarantee** | Does this Loan require a personal guarantee of payment? | | **Yes**  *(see Section 48)* | |

US_I40305676v2_391927-00001 7/16/2019 9:39 PM



| | | |
|---|---|---|
| **Prepayment** | If I prepay the outstanding loan amount, will I be required to pay any new fees or charges not included in the Total Cost of Credit? | **No** |
| | If I prepay the outstanding loan amount, will I be required to pay any remaining [Interest Expense/Loan Fees]? | **No**<br>*(see Section 10)* |

[1] The Disbursement Amount is the amount of funding that you will receive and may be different from the Loan Amount. The Disbursement Amount is net of fees withheld. A portion of the Disbursement Amount may be used to pay off any amounts owed from a prior loan or an amount owed to a third party.

[2] Your business may incur other fees that are not a condition of borrowing, such as late payment fees, returned payment fees, or monthly maintenance fees. Those fees are not reflected here. See the agreement for details on these fees (see Section 20).

[3] APR is calculated here according to the principles of 12 C.F.R. § 1026 (Regulation Z), using 12 payment periods of equal length and 50.4 payment dates per year for weekly pay products and 252 payment dates per year for daily pay products]. APR is not a substitute for interest rate and is not calculated according to state-specific laws governing interest rates.

[4] Your loan is made by FinWise Bank under the laws of the state of Utah, including those governing the amount and rates of interest that Utah-based lenders may impose (see Section 40).

© 2019 Innovative Lending Platform Association. All rights reserved. Innovative Lending Platform Association is not responsible for any misuse of the SMART Box™ or any inaccuracies in the calculations or information included therein.



**AUTHORIZATION AGREEMENT FOR
DIRECT DEPOSIT (ACH CREDIT) AND
DIRECT PAYMENTS (ACH DEBITS)**

This Authorization Agreement for Direct Deposit (ACH Credit) and Direct Payments (ACH Debits) is part of (and incorporated by reference into) the Business Loan and Security Agreement. Borrower should keep this important legal document for Borrower's records.

**DISBURSMENT OF LOAN PROCEEDS.** By signing below, Borrower authorizes Lender to disburse the Loan proceeds less the amount of any applicable fees upon Loan approval by initiating an ACH credit, wire transfer or similar means to the checking account indicated below (or a substitute checking account Borrower later identifies and is acceptable to Lender) (hereinafter referred to as the "Designated Checking Account") in the Disbursement Amount set forth in the accompanying Business Loan and Security Agreement Supplement. This authorization to credit Loan proceeds to Borrower's Designated Checking Account is to remain in full force and effect until (a) Lender has received written notification from Borrower of its termination in such time and in such manner as to afford Lender and Borrower's depository bank a reasonable opportunity to act on it, or (b) Borrower has satisfied all of its obligations set forth in the Business Loan and Security Agreement.

**AUTOMATIC PAYMENT PLAN.** Enrollment in Lender's Automatic Payment Plan, by signature of this Authorization Agreement, is required for Loan approval. By signing below, Borrower agrees to enroll in the Automatic Payment Plan and authorizes Lender to collect payments required under the terms of Borrower's Business Loan and Security Agreement by initiating ACH debit entries to the Designated Checking Account in the amounts and on the dates provided in the Payment Schedule set forth in the accompanying Business Loan and Security Agreement Supplement. Borrower authorizes Lender to increase the amount of any scheduled ACH debit entry or assess multiple ACH debits for the amount of (i) any previously scheduled payment(s) that was not paid as provided in the payment schedule and (ii) any unpaid Fees. This authorization to debit Borrower's Designated Checking Account is to remain in full force and effect until Lender has received written notification from Borrower of its termination in such time and in such manner as to afford Lender and Borrower's depository bank a reasonable opportunity to act on it or Borrower has satisfied all of its obligations set forth in the Business Loan and Security Agreement. Lender may suspend or terminate Borrower's enrollment in the Automatic Payment Plan immediately if Borrower fails to keep Borrower's designated checking account in good standing or if there are insufficient funds in Borrower's checking account to process any payment. **If Borrower revokes the authorization or Lender suspends or terminates Borrower's enrollment in the Automatic Payment Plan because of the inability to process debits to Borrower's Designated Checking Account, Borrower will be in "Default" of the Business Loan and Security Agreement as such term is defined in Section 29 therein. Upon default, Borrower will remain responsible for making timely payments pursuant to the alternative payment methods described in the Business Loan and Security Agreement.**

**BUSINESS PURPOSE ACCOUNT.** By signing below, Borrower attests that the Designated Checking Account was established for business purposes and not primarily for personal, family or household purposes.

**ACCOUNT CHANGES.** Borrower agrees to notify Lender promptly if there are any changes to the account and routing numbers of the Designated Checking Account.

**MISCELLANEOUS.** Lender is not responsible for any fees charged by Borrower's bank as the result of credits or debits initiated under this agreement. The origination of ACH transactions to Borrower's account must comply with the provisions of U.S. law.

Depository Name: **Security Service Federal Credit Union** _____

Branch: _____

City: _____ State: _____ Zip: _____

Routing Number: **314088XXX**                              Account Number: **643077XXXX**

Print Business Account Holder Name: **Christopher  Broussard**                    Tax ID Number: **47-555XXXX** _____

Signature: _Christopher Broussard_ _____          Title: **Managing Partner** _____

Date: _6/25/2021_ _____

DocuSign Envelope ID: A587C5A5-7FC8-4D86-A5F4-33D3D86A8659



**Mulligan Funding**

## BUSINESS LOAN AND SECURITY AGREEMENT

**SECTION 1.** **INTRODUCTION**. This Business Loan and Security Agreement ("Agreement") governs your business loan ("Loan") from FinWise Bank. Please read it and keep it for your reference. In this Agreement, the words "you," "your" and "Borrower" means each individual or entity that signs this Agreement or on whose behalf this Agreement is signed. The words "Lender," "we," "us", and "our" mean FinWise Bank or its successor, assigns, agents, and servicers.

**SECTION 2.** **EFFECTIVE DATE**. This Agreement begins on the date we disburse the Disbursement Amount from Utah (the "Effective Date"). Borrower understands and agrees that Lender may postpone, without penalty, the disbursement of amounts to Borrower until (i) all required security interests have been perfected, (ii) Lender has completed its required diligence related to its "know your customer" obligations under federal law, (iii) Lender has received all required personal guarantees or other documentation; and (iv) Lender has reviewed all documents and information required in connection with underwriting the Loan and has approved the Loan for funding.

**SECTION 3.** **AUTHORIZATION**. Borrower agrees that the Loan made by Lender to Borrower shall be conclusively deemed to have been authorized by Borrower and to have been made pursuant to a duly authorized request on its behalf.

**SECTION 4.** **LOAN FOR SPECIFIC PURPOSES ONLY**. The proceeds of the requested Loan may solely be used for the specific purposes as set forth in the Use of Proceeds Certification contained in Section 49 below, and not for any other purpose, including personal, family or household purposes. Borrower and each Guarantor understands that Borrower's agreement not to use the Loan proceeds for personal, family or household purposes means that certain important duties imposed upon entities making loans for consumer/personal purposes, and certain important rights conferred upon consumers, pursuant to federal or state law will not apply to the Loan or the Agreement. Borrower and each Guarantor also understand that Lender will be unable to confirm whether the use of the Loan conforms to this section. Borrower and each Guarantor agrees that a breach by Borrower of the provisions of this section will not affect Lender's right to (i) enforce Borrower's promise to pay for all amounts owed under this Agreement, regardless of the purpose for which the Loan is in fact obtained; or (ii) use any remedy legally available to Lender, even if that remedy would not have been available had the Loan been made for consumer purposes.

**SECTION 5.** **DISBURSEMENT OF LOAN PROCEEDS AND MAINTENANCE OF BORROWER'S BANK ACCOUNT**. If Borrower applied and is approved for a Loan, Borrower's Loan will be disbursed, upon approval, as provided in the accompanying Authorization Agreement for Direct Deposit (ACH Credit) and Direct Payments (ACH Debits). Borrower agrees to maintain Direct Payments (ACH Debits) in its Designated Checking Account, which is the account that was reviewed in conjunction with underwriting and approval of this Loan (including keeping such account open until the Total Repayment Amount had been completely repaid. Any change to the Designated Checking Account must be approved in advance by Lender in its sole discretion.

**SECTION 6.** **PROMISE TO PAY**. Borrower agrees to pay Lender the Total Repayment Amount shown in the accompanying Business Loan and Security Agreement Supplement in accordance with the Payment Schedule shown in the Business Loan and Security Agreement Supplement. Borrower agrees to enroll in Lender's Automatic Payment Plan and authorizes Lender to collect required payments as provided in the accompanying Authorization Agreement for Direct Deposit (ACH Credit) and Direct Payments (ACH Debits). Borrower attests that the Designated Checking Account was established by Borrower and the Loan proceeds will be used for business purposes only and not for personal, family, or household purposes.

**SECTION 7.** **ALTERNATIVE PAYMENT METHODS**. If Borrower knows that for any reason Lender will be unable to process a payment under Lender's Automatic Payment Plan, then Borrower must either restore sufficient funds such that the missed payment can be collected as provided in the accompanying Authorization Agreement for Direct Deposit (ACH Credit) and Direct Payments (ACH Debits), provide funds in a manner approved by Lender which may include the acceptance of a check; or, if offered, make the missed payment by any pay-by-phone or on-line service that Lender may make available from time to time. All alternative payments must be made in good funds by check, money order, wire transfer, automatic transfer from an account at an institution offering such service, or other instrument in U.S. Dollars. Borrower understands and agrees that payments made at any other address than as specified by Lender may result in a delay in processing and/or crediting. If Borrower makes an alternative payment on Borrower's Loan by any pay-by-phone or on-line service that Lender makes available while Borrower is enrolled in the Automatic Payment Plan, Lender may treat such payment as an additional payment and continue to process Borrower's scheduled Automatic Payment Plan payments or may reduce any scheduled Automatic Payment Plan payment by the amount of any such additional payment received, in its sole discretion.

**SECTION 8.** **APPLICATION OF PAYMENTS**. Subject to applicable law, Lender reserves the right to apply payments to Borrower's Loan in any manner Lender chooses in Lender's sole discretion it being understood and agreed that any fees and interest will generally be paid during the earlier portion of the term.

**SECTION 9.** **POSTDATED CHECKS, RESTRICTED ENDORSEMENT CHECKS AND OTHER DISPUTED OR QUALIFIED PAYMENTS**. Lender can accept late, postdated or partial payments without losing any of Lender's rights under this Agreement (a



postdated check is a check dated later than the day it was actually presented for payment). Lender is under no obligation to hold a postdated check and Lender reserves the right to process every item presented as if dated the same date received by Lender or Lender's check processor unless Borrower gives Lender adequate notice and a reasonable opportunity to act on it. Except where such notice and opportunity is given, Borrower may not hold Lender liable for depositing any postdated check. **Borrower agrees not to send Lender partial payments marked "paid in full," "without recourse," or similar language. If Borrower sends such a payment, Lender may accept it without losing any of Lender's rights under this Agreement. All notices and written communications concerning postdated checks, restricted endorsement checks (including any check or other payment instrument that indicates that the payment constitutes "payment in full" of the amount owed or that is tendered with other conditions or limitations or as full satisfaction of a disputed amount) or any other disputed, nonconforming or qualified payments, must be mailed or delivered to Mulligan Funding, LLC, 4715 Viewridge Avenue, Suite 100, San Diego, CA 92123, Attn: Accounting Dept.**

**SECTION 10.**     **PREPAYMENT**. Borrower may prepay Borrower's Loan in whole on any Business Day by paying Lender the sum total of the Total Repayment Amount, and any Returned Payment Fees, in each case as described in the accompanying Business Loan and Security Agreement Supplement less (i) any Loan payments made prior to such prepayment; and (ii) the product of (X) the percentage identified as the applicable Prepayment Discount Percentage in the accompanying Business Loan and Security Agreement Supplement; and (Y) the aggregate amount remaining on the Borrower's Loan as of such date as determined by Lender's records in accordance with Section 8, provided however that (a) at the time of the prepayment in question, Borrower's account is current and in good standing, and Borrower is not in breach of any of the terms of The Agreement; (b) this discount shall only be applicable if the payment in question is made directly from the Designated Checking Account, and not from the account of any other lender which is a competitor of the Lender's; (c) the payment is not effectively funded by the receipt by the Borrower of a loan or advance provided by a direct competitor of the Lender's; and (d) the full balance owing by the Borrower shall be paid and thereafter, within 3 business days of receipt by the Lender of proof to its reasonable satisfaction that the conditions described in (a), (b) and (c) above have been met, which proof will include at least the provision by the Borrower of its banking transaction reports for the two week period immediately preceding and the two week period immediately following the payoff in question, the amount of the discount shall be re-funded into the Designated Checking Account by the Lender. Borrower may prepay Borrower's Loan in part on any Business Day and such payment shall be applied against the Total Repayment Amount, and any Returned Payment Fees, in each case as described in the accompanying Borrower's Business Loan and Security Agreement Supplement.

**SECTION 11.**     **SECURITY INTEREST**. Borrower and/or Guarantor hereby grants to Lender, the secured party hereunder, a continuing security interest in and to any and all "Collateral" as described below to secure payment and performance of all debts, liabilities and obligations of Borrower to Lender hereunder and also any and all other debts, liabilities and obligations of Borrower to Lender of every kind and description, direct or indirect, absolute or contingent, primary or secondary, due or to become due, now existing or hereafter arising, whether or not such obligations are related to the Loan described in this Agreement, by class, or kind, or whether or not contemplated by the parties at the time of the granting of this security interest, regardless of how they arise or by what agreement or instrument they may be evidenced or whether evidenced by any agreement or instrument, and includes obligations to perform acts and refrain from taking action as well as obligations to pay money including, without limitation, all interest, other fees and expenses (all hereinafter called "Obligations"). The Collateral includes the following property that Borrower (or Guarantor, if applicable pursuant to Section 12) now owns or shall acquire or create immediately upon the acquisition or creation thereof: (i) any and all amounts owing to Borrower now or in the future from any merchant processor(s) processing charges made by customers to Borrower via credit card or debit card transactions; and (ii) all other tangible and intangible personal property, including, but not limited to (a) cash and cash equivalents, (b) inventory, (c) equipment, (d) investment property, including certificated and uncertificated securities, securities accounts, security entitlements, commodity contracts and commodity accounts, (e) instruments, including promissory notes (f) chattel paper, including tangible chattel paper and electronic chattel paper, (g) documents, (h) letter of credit rights, (i) accounts, including accounts receivables, (j) deposit accounts, (k) commercial tort claims, (l) general intangibles, including payment intangibles and software and (m) as-extracted collateral as such terms may from time to time be defined in the Uniform Commercial Code. The security interest Borrower (or Guarantor, if applicable, pursuant to Section 12) grants includes all accessions, attachments, accessories, parts, supplies and replacements for the Collateral, all products, proceeds and collections thereof and all records and data relating thereto. Lender disclaims any security interest in household goods in which Lender is forbidden by law from taking a security interest.

**SECTION 12.**     **PROTECTING THE SECURITY INTEREST**. Borrower and each Guarantor agrees that Lender and/or Lender's Representative may file any financing statement, lien entry form or other document Lender and/or Lender's Representative requires in order to perfect, amend or continue Lender's security interest in the Collateral and Borrower and each Guarantor agrees to cooperate with Lender and Lender's Representative as may be necessary to accomplish said filing and to do whatever Lender or Lender's Representative deems necessary to protect Lender's security interest in the Collateral. Borrower and each Guarantor agree that, if any Guarantor is a corporate entity, then Lender or Lender's Representative may file any financing statement, lien entry form or other document against such Guarantor or its property that Lender and/or Lender's Representative requires in order to perfect, amend or continue Lender's security interest in the Collateral. Any such Guarantor agrees to cooperate with Lender and Lender's Representative as may be necessary to accomplish said filing and to do whatever Lender and Lender's Representative deems necessary to protect Lender's security interest in the Collateral. In this Agreement, "Lender's Representative" means any entity or individual that is designated by Lender to serve in such capacity.

**SECTION 13.**     **LOCATION OF COLLATERAL; TRANSACTIONS INVOLVING COLLATERAL**. Unless Lender has agreed otherwise in writing, Borrower agrees and warrants that (i) all Collateral (or records of the Collateral in the case of accounts, chattel paper and general intangibles) shall be located at Borrower's address as shown in the application; (ii) except for inventory sold or accounts collected in the ordinary course of Borrower's business, Borrower shall not sell, offer to sell, or otherwise transfer or dispose of the Collateral; (iii) no one

7



else has any interest in or claim against the Collateral that Borrower has not already disclosed to Lender in writing prior to the Effective Date; (iv) Borrower shall not pledge, mortgage, encumber or otherwise permit the Collateral to be subject to any lien, security interest, encumbrance or charge, other than the security interest provided for in this Agreement without written consent of Lender; and (v) Borrower shall not sell, offer to sell, or otherwise transfer or dispose of the Collateral for less than the fair market value thereof. Borrower shall defend Lender's rights in the Collateral against the claims and demands of all other persons. All proceeds from any unauthorized disposition of the Collateral shall be held in trust for Lender, shall not be co-mingled with any other funds and shall immediately be delivered to Lender. This requirement, however, does not constitute consent by Lender to any such disposition.

SECTION 14.        TAXES, ASSESSMENTS AND LIENS. Borrower will complete and file all necessary federal, state and local tax returns and will pay when due all taxes, assessments, levies and liens upon the Collateral. Borrower shall provide evidence of such payments to Lender upon request.

SECTION 15.        INSURANCE. Borrower shall procure and maintain such insurance as Lender may require with respect to its Collateral, real property, commercial liability, fire, theft, and other risks, in form, amounts and coverage reasonably acceptable to Lender and issued by a company reasonably acceptable to Lender naming Lender as loss payee. If Borrower at any time fails to obtain or maintain any insurance as required under this Agreement, Lender may at its option obtain such insurance as Lender deems appropriate at Borrower's sole cost and expense. Borrower shall promptly notify Lender of any loss of or damage to the Collateral. Lender is under no obligation to purchase any particular type of amount of coverage.  Borrower and each Guarantor acknowledge that the cost of any insurance coverage so obtained might significantly exceed the cost of insurance that Borrower could have obtained.

SECTION 16.        REPAIRS AND MAINTENANCE. Borrower and each Guarantor agree to keep and maintain, and to cause others to keep and maintain, the Collateral in good order, repair and condition at all times while this Agreement remains in effect. Borrower further agrees to pay when due all claims for work done on, or services rendered or material furnished in connection with the Collateral so that no lien or encumbrance may ever attach to or be filed against the Collateral.

SECTION 17.        INSPECTION OF COLLATERAL AND PLACE OF BUSINESS; USE OF PHOTOGRAPHS AND TESTIMONIALS. Lender and Lender's designated representatives and agents shall have the right during Borrower's normal business hours and at any other reasonable time to examine the Collateral wherever located and the interior and exterior of any Borrower's place of business. During an examination of any Borrower's place of business, Lender may examine, among other things, whether Borrower (i) has a place of business that is operational and separate from any personal residence; (ii) is open for business; (iii) has sufficient inventory to conduct Borrower's business; or (iv) has one or more credit card terminals if Borrower processes credit card transactions. When performing an examination, Lender may photograph the interior and exterior of any Borrower place of business, including any signage, and may photograph any individual who has signed the Agreement ("Signatory") unless the Signatory previously has notified Lender that he or she does not authorize Lender to photograph the Signatory. Lender may obtain testimonials from any Signatory, including testimonials on why Borrower needed the Loan and how the Loan has helped Borrower. Any photograph and testimonial will become and remain the sole property of Lender. Borrower and each Signatory grant Lender the irrevocable and permanent right to display and share any photograph and testimonial in all forms and media, including composite and modified representations, for all purposes, including but not limited to any trade or commercial purpose, with any Lender employees and agents and with the general public. Lender may, but is not required to, use the name of any Borrower and Signatory as a credit in connection with any photograph and testimonial. Borrower and each Signatory waive the right to inspect or approve versions of any photograph or testimonial or the written copy or other media that may be used in connection with same. Borrower and each Signatory release Lender from any claims that may arise regarding the use of any photograph or testimonial, including any claims of defamation, invasion of privacy or infringement of moral rights, rights of publicity or copyright.

SECTION 18.        LENDER'S EXPENDITURES. If any action or proceeding is commenced that would materially affect Lender's interest in the Collateral as described above and in the Personal Guaranty set forth in Section 48 (if applicable), or if Borrower fails to comply with any provision of this Agreement or any related documents, including but not limited to Borrower's failure to discharge or pay when due any amounts Borrower is required to discharge or pay under this Agreement or any related documents, Lender on Borrower's behalf may (but shall not be obligated to) take any action that Lender deems appropriate, including but not limited to discharging or paying all taxes, liens, security interest, encumbrances and other claims, at any time levied or placed on the Collateral and paying all costs for insuring, maintaining and preserving the Collateral. To the extent permitted by applicable law, all such expenses will become a part of the Obligations and, at Lender's option, will: (i) be payable on demand; (ii) be added to the balance of the Loan and be apportioned among and be payable with any installment payments to become due during the remaining term of the Loan; or (iii) be treated as a balloon payment that will be due and payable at the Loan's maturity. Such right shall be in addition to all other rights and remedies to which Lender may be entitled upon an Event of Default as described in Section 29.

SECTION 19.        BORROWER'S REPRESENTATIONS AND WARRANTIES. Borrower represents and warrants that: (i) Borrower will comply with all laws, statutes, regulations and ordinances pertaining to the conduct of Borrower's business and promises to hold Lender harmless from any damages, liabilities, costs, expenses (including attorneys' fees) or other harm arising out of any violation thereof; (ii) Borrower's principal executive office and the office where Borrower keeps its records concerning its accounts, contract rights and other property, is that shown in the application; (iii) Borrower is duly organized, licensed, validly existing and in good standing under the laws of its state of formation and shall hereafter remain in good standing in that state, and is duly qualified, licensed and in good standing in every other



state in which it is doing business, and shall hereafter remain duly qualified, licensed and in good standing in every other state in which it is doing business, and shall hereafter remain duly qualified, licensed and in good standing in every other state in which the failure to qualify or become licensed could have a material adverse effect on the financial condition, business or operations of Borrower; (iv) the exact legal name of the Borrower is set forth in the application; (v) the aggregate ownership percentage of the Signatories is greater than or equal to fifty percent (50%) of the Borrower's business; (vi) the execution, delivery and performance of this Agreement, and any other document executed in connection herewith, are within Borrower's powers, have been duly authorized, are not in contravention of law or the terms of Borrower's charter, by-laws or other organization papers, or of any indenture, agreement or undertaking to which Borrower is a party; (vii) all organization papers and all amendments thereto of Borrower have been duly filed and are in proper order and any capital stock issued by Borrower and outstanding was and is properly issued and all books and records of Borrower are accurate and up to date and will be so maintained; (viii) Borrower (a) is subject to no charter, corporate or other legal restriction, or any judgment, award, decree, order, governmental rule or regulation or contractual restriction that could have a material adverse effect on its financial condition, business or prospects, and (b) is in compliance with its organization documents and by-laws, all contractual requirements by which it may be bound and all applicable laws, rules and regulations other than laws, rules or regulations the validity or applicability of which it is contesting in good faith or provisions of any of the foregoing the failure to comply with which cannot reasonably be expected to materially adversely affect its financial condition, business or prospects, the value of the Collateral or the value of the Personal Guaranty; and (ix) there is no action, suit, proceeding or investigation pending or, to Borrower's knowledge, threatened against or affecting it or any of its assets before or by any court or other governmental authority, which, if determined adversely to it, would have a material adverse effect on its financial condition, business or prospects or the value of the Collateral or Personal Guaranty.

        **SECTION 20.**        **INTEREST AND FEES.** Borrower agrees to pay the Interest Charges in full as set forth in the accompanying Business Loan and Security Agreement Supplement. In addition to any other fees described in the Agreement, Borrower agrees to pay the following fees:

A.        Origination Fee: A one-time Origination Fee in the amount set forth in the accompanying Business Loan and Security Agreement Supplement. Borrower agrees that this fee will be immediately deducted from the proceeds of Borrower's Loan.

B.        Returned Payment Fee: A Returned Payment Fee in the amount set forth in the accompanying Business Loan and Security Agreement Supplement if any payment processed on Borrower's Loan is returned unpaid or dishonored for any reason.

Payments made by Borrower will be applied towards Loan interest and principal, interest and fees in the manner set forth in Section 8.

        **SECTION 21.**        **INTEREST AND FEES EXCEEDING PERMITTED LIMIT.** If the Loan is subject to a law that sets maximum charges, and that law is finally interpreted so that the interest or other fees collected or to be collected in connection with this Agreement exceed the permitted limits, then (i) any such charge will be reduced by the amount necessary to reduce the charge to the permitted limit; and (ii) if required by any law, any sums already collected from Borrower that exceed the permitted limits will be refunded or credited to Borrower.

        **SECTION 22.**        **FINANCIAL INFORMATION AND REEVALUATION OF CREDIT.** Borrower and each Guarantor (if any) authorize Lender to obtain business and personal credit bureau reports in Borrower's and any Guarantor's name, respectively, at any time and from time to time for purposes of deciding whether to approve the requested Loan or for any update, renewal, extension of credit or other lawful purpose. Upon Borrower's or any Guarantor's request, Lender will advise Borrower or Guarantor if Lender obtained a credit report and Lender will give Borrower or Guarantor the credit bureau's name and address. Borrower and each Guarantor (if any) agree to submit current financial information, a new credit application, or both, in Borrower's name and in the name of each Guarantor, respectively, at any time promptly upon Lender's request. Borrower authorizes Lender to act as Borrower's agent for purposes of accessing and retrieving transaction history information regarding Borrower from any lender to Borrower, or other entity with which Borrower has a contract for the payment of funds borrowed or advanced. Lender may report Lender's credit experiences with Borrower and any Guarantor of Borrower's Loan to third parties as permitted by law. Borrower also agrees that Lender may release information to comply with governmental reporting or legal process that Lender believes may be required, whether or not such is in fact required, or when necessary or helpful in completing a transaction, or when investigating a loss or potential loss. Borrower and each Guarantor is hereby notified that a negative credit report reflecting on Borrower and/or Guarantor's credit record may be submitted to a credit reporting agency if Borrower or such Guarantor fails to fulfill the terms of their respective credit obligations hereunder.

        **SECTION 23.**        **ATTORNEYS' FEES AND COLLECTION COSTS.** To the extent not prohibited by applicable law, Borrower shall pay to Lender on demand any and all expenses, including, but not limited to, collection costs, all attorneys' fees and expenses, and all other expenses of like or unlike nature which may be expended by Lender to obtain or enforce payment of Obligations either as against Borrower or any Guarantor or surety of Borrower or in the prosecution or defense of any action or concerning any matter growing out of or connected with the subject matter of this Agreement, the Obligations, or the Collateral, or any of Lender's rights or interests therein or thereto, including, without limiting the generality of the foregoing, any counsel fees or expenses incurred in any bankruptcy or insolvency proceedings and all costs and expenses (including search fees) incurred or paid by Lender in connection with the administration, supervision, protection or realization on any security held by Lender for the debt secured hereby, whether such security was granted by Borrower or by any other person primarily or secondarily liable (with or without recourse) with respect to such debt, and all costs and expenses incurred by Lender in connection with the defense, settlement or satisfaction of any action, claim or demand asserted against Lender in connection therewith, which amounts

9



shall be considered advances to protect Lender's security, and shall be secured hereby. To the extent permitted by applicable law, all such expenses will become a part of the Obligations and, at Lender's option, will: (i) be payable on demand; (ii) be added to the balance of the Loan and be apportioned among and be payable with any installment payments to become due during the remaining term of the Loan; or (iii) be treated as a balloon payment that will be due and payable at the Loan's maturity. Such right shall be in addition to all other rights and remedies to which Lender may be entitled upon an Event of Default.

SECTION 24.      BORROWER'S REPORTS. Promptly upon Lender's written request, Borrower and each Guarantor agree to provide Lender with such information about the financial condition and operations of Borrower or any Guarantor, as Lender may, from time to time, reasonably request. Borrower also agrees promptly upon becoming aware of any Event of Default as described in Section 29, or the occurrence or existence of an event which, with the passage of time or the giving of notice or both, would constitute an Event of Default hereunder, to promptly provide notice thereof to Lender in writing.

SECTION 25.      TELEPHONE COMMUNICATIONS. Borrower hereby expressly consents to receiving calls and messages related to the Loan or this Agreement, including auto-dialed and pre-recorded message calls and SMS messages (including text messages) from Lender, its affiliates, agents and others calling at Lender's request or on its behalf, at any telephone numbers that Borrower has provided or may provide in the future or otherwise in Lender's possession (including any cellular or mobile telephone numbers).

SECTION 26.      INDEMNIFICATION. Except for Lender's gross negligence or willful misconduct, Borrower will indemnify and save Lender harmless from all loss, costs, damage, liability or expenses (including, without limitation, court costs and reasonable attorneys' fees) that Lender may sustain or incur by reason of defending or protecting Lender's security interest or the priority thereof or enforcing the Obligations, or in the prosecution or defense of any action or proceeding concerning any matter growing out of or in connection with this Agreement and/or any other documents now or hereafter executed in connection with this Agreement and/or the Obligations and/or the Collateral. This indemnity shall survive the repayment of the Obligations and the termination of this Agreement.

SECTION 27.      MERGERS, CONSOLIDATIONS OR SALES. Borrower represents and agrees that Borrower will not, without Lender's prior written consent, (i) merge or consolidate with or into any other business entity; or (ii) enter into any joint venture or partnership with any person, firm or corporation.

SECTION 28.      CHANGE IN LEGAL STATUS. Without Lender's prior written consent, Borrower represents and agrees that Borrower will not (i) change its name, its place of business or, if more than one, chief executive office, its mailing address, or organizational identification number if it has one; or (ii) change its type of organization, jurisdiction of organization or other legal structure. If Borrower does not have an organizational identification number and later obtains one, Borrower shall promptly notify Lender of such taxpayer identification number.

SECTION 29.      DEFAULT. The occurrence of any one or more of the following events (herein, "Events of Default") shall constitute, without notice or demand, a default under this Agreement and all other agreements between Lender and Borrower and instruments and papers given Lender by Borrower, whether such agreements, instruments, or papers now exist or hereafter arise: (i) Lender is unable to collect any Automatic Payment Plan payment on [two] consecutive payment due dates, and/or, Borrower fails to pay any Obligations on [two] consecutive payment due dates, and/or Borrower notifies Lender of its intention to terminate the Authorization Agreement for Direct Deposits (ACH Credits) and Direct Payments (ACH Debits), attached to this Business Loan and Security Agreement; (ii) Borrower fails to comply with, promptly, punctually and faithfully perform or observe any term, condition or promise within this Agreement; (iii) the determination by Lender that any representation or warranty heretofore, now or hereafter made by Borrower to Lender, in any documents, instrument, agreement, or paper was not true or accurate when given; (iv) the occurrence of any event such that any indebtedness of Borrower from any lender other than Lender could be accelerated, notwithstanding that such acceleration has not taken place; (v) the occurrence of any event that would cause a lien creditor, as that term is defined in Section 70A-9a-102 of the Utah Uniform Commercial Code, (other than Lender) to take priority over the Loan made by Lender; (vi) a filing against or relating to Borrower (unless consented to in writing by Lender) of (a) a federal tax lien in favor of the United States of America or any political subdivision of the United States of America, or (b) a state tax lien in favor of any state of the United States of America or any political subdivision of any such state; (vii) the occurrence of any event of default under any other agreement between Lender and Borrower or instrument or paper given Lender by Borrower, whether such agreement, instrument, or paper now exists or hereafter arises (notwithstanding that Lender may not have exercised its rights upon default under any such other agreement, instrument or paper); (viii) any act by, against, or relating to Borrower, or its property or assets, which act constitutes the application for, consent to, or sufferance of the appointment of a receiver, trustee or other person, pursuant to court action or otherwise, over all, or any part of Borrower's property; (ix) the granting of any trust, mortgage or execution of an assignment for the benefit of the creditors of Borrower, or the occurrence of any other voluntary or involuntary liquidation or extension of debt agreement for Borrower; (x) the failure by Borrower to generally pay the debts of Borrower as they mature; (xi) adjudication of bankruptcy or insolvency relative to Borrower; (xii) the entry of an order for relief or similar order with respect to Borrower in any proceeding pursuant to Title 11 of the United States Code entitled "Bankruptcy" (the "Bankruptcy Code") or any other federal bankruptcy law; (xiii) the filing of any complaint, application or petition by or against Borrower initiating any matter in which Borrower is or may be granted any relief from the debts of Borrower pursuant to the Bankruptcy Code or any other insolvency statute or procedure; (xiv) the calling or sufferance of a meeting of creditors of Borrower; (xv) the meeting by Borrower with a formal or informal creditors committee; (xvi) the offering by or entering into by Borrower of any composition, extension or any other arrangement seeking relief or extension for the debts of Borrower, or the initiation of any other judicial or non-judicial proceeding or agreement by, against or including Borrower that



seeks or intends to accomplish a reorganization or arrangement with creditors; (xvii) the entry of any judgment against Borrower, which judgment is not satisfied or appealed from (with execution or similar process stayed) within 15 days of its entry; (xviii) the occurrence of any event or circumstance with respect to Borrower such that Lender shall believe in good faith that the prospect of payment of all or any part of the Obligations or the performance by Borrower under this Agreement or any other agreement between Lender and Borrower is impaired or there shall occur any material adverse change in the business or financial condition of Borrower (such event specifically includes, but is not limited to, taking additional financing from a third party funder in connection with a merchant cash advance or a working capital loan, in respect of which either daily or weekly payments are made, without the prior written consent of Lender); (xix) the entry of any court order that enjoins, restrains or in any way prevents Borrower from conducting all or any part of its business affairs in the ordinary course of business; (xx) the occurrence of any uninsured loss, theft, damage or destruction to any material asset(s) of Borrower; (xxi) any act by or against, or relating to Borrower or its assets pursuant to which any creditor of Borrower seeks to reclaim or repossess or reclaims or repossesses all or a portion of Borrower's assets; (xxii) the termination of existence, dissolution or liquidation of Borrower or the ceasing to carry on actively any substantial part of Borrower's current business; (xxiii) this Agreement shall, at any time after its execution and delivery and for any reason, cease to be in full force and effect or shall be declared null and void, or the validity or enforceability hereof shall be contested by Borrower or any Guarantor of Borrower denies it has any further liability or obligation hereunder; (xxiv) any Guarantor or person signing a support agreement in favor of Lender shall repudiate, purport to revoke or fail to perform his or her obligations under his Guaranty or support agreement in favor of Lender or any corporate Guarantor shall cease to exist; (xxv) any material change occurs in Borrower's ownership or organizational structure (acknowledging that any change in ownership will be deemed material when ownership is closely held); (xxvi) if Borrower is a trust, a trustor dies; if Borrower is a partnership, any general or managing partner dies; if Borrower is a corporation, any principal officer or 10% or greater shareholder dies; if Borrower is a limited liability company, any managing member dies; if Borrower is any other form of business entity, any person(s) directly or indirectly controlling 10% or more of the ownership interests of such entity dies; or (xxvii) any Guarantor dies.

SECTION 30.         DEFAULT RATE OF INTEREST. To the extent permitted under applicable law, if any amount payable under this Agreement is not paid when due (without regard to any applicable grace periods), whether at the stated maturity, by acceleration or otherwise, in full on the due date for such payment, or upon acceleration of this Agreement, the then outstanding Loan Amount of this Agreement shall bear interest at the Simple Interest Rate on Total Funding Amount set forth in the Business Loan and Security Agreement Supplement (the "Default Rate") from the date payment was due until such delinquent payment is paid in full to Lender. If the Default Rate is triggered as a result of an Event of Default and Borrower subsequently cures the Event of Default, then all amounts owing hereunder to Lender after such cure will resume bearing interest at the Simple Interest Rate for New Funding Amount rather than at the Default Rate, on the date the Event of Default is cured; provided, however, that the amount owing hereunder may again accrue interest at the Default Rate upon the occurrence of a subsequent Event of Default. This provision shall not imply that Borrower may cure any default or Event of Default or reinstate the Loan after an Event of Default other than as expressly permitted under the terms of this Agreement, nor shall this provision imply that Borrower has a right to delay or extend the dates upon which payments are due under this Agreement. Borrower acknowledges that it would be extremely difficult or impracticable to determine Lender's actual damages resulting from any late payment or default, and such interest at the Default Rate is a reasonable estimate of those damages and does not constitute a penalty. The remedies of Lender in this Agreement, or at law or in equity, shall be cumulative and concurrent, and may be pursued individually, successively, or together in Lender's discretion.

SECTION 31.         RIGHTS AND REMEDIES UPON DEFAULT. Subject to applicable law, if an Event of Default as described in Section 29 occurs under this Agreement, at any time thereafter, Lender may exercise any one or more of the following rights and remedies:

i.   Refrain from Disbursing Loan Proceeds: Lender may refrain from disbursing Borrower's Loan proceeds or any other amounts which may be due to the Borrower, to Borrower's Designated Checking Account, in respect of this or any future Loan concluded between Borrower and Lender.

ii.  Debit Amounts Due From Borrower's Accounts: Lender may debit from Borrower's Designated Checking Account all Automatic Payment Plan payments that Lender was unable to collect and/or the amount of any other Obligations that Borrower failed to pay, including any "Accelerated Indebtedness as defined below.

iii. Accelerate Indebtedness: Lender may declare the entire Obligations immediately due and payable, without notice of any kind to Borrower.

iv.  Assemble Collateral: Lender may require Borrower and/or Guarantor to deliver to Lender all or any portion of the Collateral and any and all certificates of title and other documents relating to the Collateral. Lender may require Borrower and/or Guarantor to assemble the Collateral and make it available to Lender at a place to be designated by Lender. Lender also shall have full power to enter, provided Lender does so without a breach of the peace or a trespass, upon the property of Borrower and/or Guarantor to take possession of and remove the Collateral. If the Collateral contains other goods not covered by this Agreement at the time of repossession, Borrower and Guarantor agree Lender may take such other goods, provided that Lender makes reasonable efforts to return them to Borrower and Guarantor after repossession.

v.   Sell the Collateral: Lender shall have full power to sell, lease, transfer, or otherwise deal with the Collateral or proceeds thereof in Lender's own name or that of Borrower and/or Guarantor. Lender may sell the Collateral at public auction or private sale. Unless the Collateral threatens to decline speedily in value or is of a type customarily sold on a recognized market, Lender will give Borrower, Guarantor and other persons as required by law, reasonable notice of the time and place of any public sale, or the time after which any private sale or any other disposition of the Collateral is to be made. However, no notice need be provided to any person who, after an Event of Default occurs, enters into and



authenticates an agreement waiving that person's right to notification of sale. The requirements of reasonable notice shall be met if such notice is given at least 10 days before the time of the sale or disposition. All expenses relating to the disposition of the Collateral, including without limitation the expenses of retaking, holding, insuring, preparing for sale and selling the Collateral, shall become a part of the Obligations secured by this Agreement. To the extent permitted by applicable law, all such expenses will become a part of the Obligations and, at Lender's option, will: (i) be payable on demand; (ii) be added to the balance of the Loan and be apportioned among and be payable with any installment payments to become due during either (a) the term of any applicable insurance policy or (b) the remaining term of the Loan; or (iii) be treated as a balloon payment that will be due and payable at the Loan's maturity.

vi.    Appoint Receiver: Lender shall have the right to have a receiver appointed to take possession of all or any part of the Collateral, with the power to protect and preserve the Collateral, to operate the Collateral preceding foreclosure or sale, and to collect the rents from the Collateral and apply the proceeds, over and above the cost of the receivership, against the Obligations. The receiver may serve without bond if permitted by law. Lender's right to the appointment of a receiver shall exist whether or not the apparent value of the Collateral exceeds the Obligations by a substantial amount. Employment by Lender shall not disqualify a person from serving as a receiver.

vii.   Collect Revenues, Apply Accounts: Lender, either itself or through a receiver, may collect the payments, rents, income, and revenues from the Collateral. Lender may at any time in Lender's discretion transfer any Collateral into Lender's own name or that of Lender's nominee and receive the payments, rents, income and revenues therefrom and hold the same as security for the Obligations or apply it to payment of the Obligations in such order of preference as Lender may determine. Insofar as the Collateral consists of accounts, general intangibles, insurance policies, instruments, chattel paper, choses in action, or similar property, Lender may demand, collect, receipt for, settle, compromise, adjust, sue for, foreclose or realize on the Collateral as Lender may determine, whether or not any amount included within the Obligations is then due. For these purposes, Lender may, on behalf of and in the name of Borrower and/or Guarantor, receive, open and dispose of mail addressed to Borrower; change any address to which mail and payments are to be sent; and endorse notes, checks, drafts, money orders, documents of title, instruments and items pertaining to payment, shipment or storage of any Collateral. To facilitate collections, Lender may notify account debtors and obligors on any Collateral to make payments directly to Lender.

viii.  Obtain Deficiency: If Lender chooses to sell any or all of the Collateral, Lender may obtain a judgment against Borrower and/or Guarantor for any deficiency remaining on the Obligations due to Lender after application of all amounts received from the exercise of the rights provided in this Agreement. Borrower and/or Guarantor shall be liable for a deficiency even if the transaction described in this subsection is a sale of accounts or chattel paper.

ix.    Other Rights and Remedies: Lender shall have all the rights and remedies of a secured creditor under the provisions of the Utah Uniform Commercial Code, as may be amended from time to time. In addition, Lender shall have and may exercise any or all other rights and remedies it may have available at law, in equity or otherwise.

x.     Setoff. In addition to any rights and remedies of the Lender provided by law, if Borrower is in default, Lender is authorized at any time and form time to time, without prior notice to Borrower, any such notice being waived by the Borrower to the fullest extent permitted by law, to set off and apply any and all deposits (general or special, time or demand, provisional or final) at any time held by, and other indebtedness at any time owing to, the Lender to or for the credit or the account of the Borrower against any and all obligations owing to the Lender, now or hereafter existing, irrespective of whether such obligations may be contingent or unmatured.  The Lender agrees promptly to notify the Borrower after any such setoff and application made by the Lender; provided, however, that the failure to give such notice shall not affect the validity of such setoff and application.

xi.    Election of Remedies: Except as may be prohibited by applicable law, all of Lender's rights and remedies, whether evidenced by this Agreement, any related documents, or by any other writing, shall be cumulative and may be exercised singularly or concurrently. Election by Lender to pursue any remedy shall not exclude pursuit of any other remedy, and an election to make expenditures or to take action to perform an obligation of Borrower under the Agreement, after Borrowers failure to perform, shall not affect Lender's right to declare a default and exercise its remedies.

        SECTION 32.        CONSENT TO JURISDICTION AND VENUE. Subject to Section 33 below, Borrower, each Guarantor and Lender agree that any action or proceeding to enforce or arising out of this Agreement may be brought in any court of the State of Utah or in the United States District Court for the District of Utah, and Borrower and each Guarantor waives personal service of process. Borrower, each Guarantor and Lender agree that venue is proper in such courts.

        SECTION 33.        ARBITRATION/CLASS ACTION WAIVER. To the extent that a claim or dispute arises out of, or in relation to this Agreement, including without limitation, the terms, construction, interpretation, performance, termination, breach, or enforceability of this Agreement, the parties hereby agree that the claim or dispute shall be, at the election of either party, resolved by mandatory binding arbitration in Utah within a reasonable time period not to exceed ninety (90) days. The parties agree that the arbitration shall be administered by JAMS and the arbitration shall be conducted in accordance with the Expedited Procedures of the JAMS Comprehensive Arbitration Rules and Procedures except as otherwise agreed in this Agreement. The arbitrator shall be chosen in accordance with the procedures of JAMS, and shall base the award on applicable Utah law. Judgment on the award may be entered in any court having jurisdiction, subject to Section 32 above. The parties further agree that the costs of the arbitration shall be divided equally between them, except that Lender will consider in good

US_140305676v2_391927-00001 7/16/2019 9:39 PM



faith a request by Borrower to pay the costs of arbitration. **Each party may pursue arbitration solely in an individual capacity, and not as a representative or class member in any purported class or representative proceeding. The arbitrator may not consolidate more than one person's or entity's claims, and may not otherwise preside over any form of a representative or class proceeding. This arbitration section is governed by the Federal Arbitration Act, 9 U.S.C. §§ 1-16.**

**SECTION 34.**        **NO WAIVER BY LENDER**. No delay or omission on the part of Lender in exercising any rights under this Agreement, any related guaranty or applicable law shall operate as a waiver of such right or any other right. Waiver on any one occasion shall not be construed as a bar to or waiver of any right or remedy on any future occasion. All Lender's rights and remedies, whether evidenced hereby or by any other agreement, instrument or paper, shall be cumulative and may be exercised singularly or concurrently. No waiver by Lender of any of its rights or of any such breach, default, or failure of condition shall be effective, unless the waiver is expressly stated in a writing signed by Lender.

**SECTION 35.**        **ASSIGNMENT**. This Agreement shall bind and inure to the benefit of the respective successors and assigns of each of the parties hereto; provided, however, that Borrower may not assign this Agreement or any rights or duties hereunder without Lender's prior written consent and any prohibited assignment shall be absolutely null and void. No consent to an assignment by Lender shall release Borrower from its obligations. Lender may assign this Agreement and its rights and duties hereunder and no consent or approval by Borrower is required in connection with any such assignment. Lender reserves the right to sell, assign, transfer, negotiate or grant participations in all or any part of, or any interest in Lender's rights and benefits hereunder. In connection with any assignment or participation, Lender may disclose all documents and information that Lender now or hereafter may have relating to Borrower or Borrower's business. To the extent that Lender assigns its rights and obligations hereunder to another party, Lender thereafter shall be released from such assigned obligations to Borrower and such assignment shall affect a novation between Borrower and such other party.

**SECTION 36.**        **INTERPRETATION**. Paragraph and section headings used in this Agreement are for convenience only, and shall not affect the construction of this Agreement. Neither this Agreement nor any uncertainty or ambiguity herein shall be construed or resolved against Lender or Borrower, whether under any rule of construction or otherwise. On the contrary, this Agreement has been reviewed by all parties and shall be construed and interpreted according to the ordinary meaning of the words used so as to fairly accomplish the purposes and intentions of all parties hereto. Borrower has obtained the advice of counsel prior to executing this Agreement.

**SECTION 37.**        **SEVERABILITY**. If one or more provisions of this Agreement (or the application thereof) is determined invalid, illegal or unenforceable in any respect in any jurisdiction, the same shall not invalidate or render illegal or unenforceable such provision (or its application) in any other jurisdiction or any other provision of this Agreement (or its application).

**SECTION 38.**        **NOTICES**. Except as otherwise provided in this Agreement, notice under this Agreement must be in writing. Notices will be deemed given when deposited in the U.S. mail, postage prepaid, and first class mail; when delivered in person; or when sent by registered mail; by certified mail; or by nationally recognized overnight courier; or when sent by electronic mail. Notice to Borrower will be sent to Borrower's last known address or electronic mail address in Lender's records for this Loan. Notice to Lender may be sent to: **Mulligan Funding LLC, 4715 Viewridge Ave, San Diego, CA 92123 – Att: Accounting Dept**. Borrower agrees to notify Lender immediately if Borrower changes Borrower's name, Borrower's postal or electronic mail address or other contact information, if there are any errors in the information regarding transactions on Borrower's account provided by Borrower to Lender, or any of Borrower or Guarantor(s) dies, is declared incompetent or is subject of a bankruptcy or insolvency proceeding. Borrower and Guarantor(s) agree that a notice of incompetence is not effective unless issued by a court having jurisdiction, and Lender receives notice and instruction from the Court. Notwithstanding the above, Lender may, at Lender's option, accept other evidence of incompetence acceptable to Lender. Borrower and Guarantor(s) agree to indemnify and hold Lender harmless from and against any and all claims relating to the acceptance or non-acceptance of proof of incompetence in any transaction. This indemnity will survive termination of this Agreement.

**SECTION 39.**        **RECORDKEEPING AND AUDIT REQUIREMENTS**. Lender shall have no obligation to maintain any electronic records or any documents, schedules, invoices or any other paper delivered to Lender by Borrower in connection with this Agreement or any other agreement other than as required by law. Borrower will at all times keep accurate and complete records of Borrower's accounts and Collateral. At Lender's request, Borrower shall deliver to Lender (i) schedules of accounts and general intangibles; and (ii) such other information regarding the Collateral and Loan as Lender shall request. Lender, or any of its agents, shall have the right to call any telephone numbers that Borrower has provided or may provide in the future or otherwise in the Lender's possession (including any cellular or mobile telephone number) at intervals to be determined by Lender, and without hindrance or delay, to inspect, audit, check, and make extracts from any copies of the books, records, journals, orders, receipts, correspondence that relate to Borrower's accounts, Collateral, or other transactions between the parties thereto and the general financial condition of Borrower and Lender may remove any of such records temporarily for the purpose of having copies made thereof. If Borrower was referred to Lender for this Loan by a third party (the "Referring Party"), then Borrower consents to Lender sharing certain reasonable information about Borrower with the Referring Party for purposes of the Referring Party verifying and/or auditing loans made through such Referring Party's referrals.

**SECTION 40.**        **GOVERNING LAW**. Subject to Section 33 above, our relationship including this Agreement and any claim, dispute or controversy (whether in contract, tort, or otherwise) at any time arising from or relating to this Agreement is governed by, and this Agreement will be construed in accordance with, applicable federal law and (to the extent not preempted by federal law) Utah law without

13



regard to internal principles of conflict of laws. The legality, enforceability and interpretation of this Agreement and the amounts contracted for, charged and reserved under this Agreement will be governed by such laws. Borrower understands and agrees that (i) Lender is located in Utah; (ii) Lender makes all credit decisions from Lender's office in Utah; (iii) the Loan is made in Utah (that is, no binding contract will be formed until Lender receives and accepts Borrower's signed Agreement in, and disburses the Loan Disbursement Amount from, Utah); and (iv) Borrower's payments are not accepted until received by Lender.

SECTION 41.    WAIVER OF NOTICES AND OTHER TERMS. Except for any notices provided for in this Agreement, Borrower and any person who has obligations pursuant to this Agreement (e.g., a Guarantor), to the extent not prohibited by applicable law hereby, waives demand, notice of nonpayment, notice of intention to accelerate, notice of acceleration, presentment, protest, notice of dishonor and notice of protest. To the extent permitted by applicable law, Borrower and any person who has obligations pursuant to this Agreement also agrees: Lender is not required to file suit, show diligence in collection against Borrower or any person who has obligations pursuant to this Agreement, or proceed against any Collateral. Lender may, but will not be obligated to, substitute, exchange or release any Collateral; Lender may release any Collateral, or fail to realize upon or perfect Lender's security interest in any Collateral; Lender may, but will not be obligated to, sue one or more persons without joining or suing others; and Lender may modify, renew, or extend this Agreement (repeatedly and for any length of time) without notice to or approval by any person who has obligations pursuant to this Agreement (other than the party with whom the modification, renewal or extension is made).

SECTION 42.    MONITORING, RECORDING AND ELECTRONIC COMMUNICATIONS. In order to ensure a high quality of service for Lender's customers, Lender may monitor and/or record telephone calls between Borrower and Lender's employees or agents. Borrower acknowledges that Lender may do so and agrees in advance to any such monitoring or recording of telephone calls. Borrower also agrees that Lender may communicate with Borrower electronically by e-mail.

SECTION 43.    JURY TRIAL WAIVER. To the extent not prohibited by applicable law and to the extent Section 33 is not operative, Borrower and each Guarantor knowingly, intentionally, and voluntarily, with and upon the advice of competent counsel, and Lender by its acceptance hereof, waive their right to a trial by jury of any claim or cause of action based upon, arising out of or related to the Agreement and all other documentation evidencing the obligations, in any legal action or proceeding. Any such claim or cause of action shall be tried by court sitting without a jury.

SECTION 44.    CONFIDENTIALITY. Borrower shall not make, publish or otherwise disseminate in any manner a copy of this Agreement or any public statement or description of the terms of this Agreement, except to its employees, advisors and similar persons who have a legitimate need to know its contents.

SECTION 45.    ENTIRE AGREEMENT. Any application Borrower signed or otherwise submitted in connection with the Loan, the accompanying Business Loan and Security Agreement Supplement and the Authorization Agreement for Direct Deposit (ACH Credit) and Direct Payments (ACH Debits) and any other documents required by Lender now or in the future in connection with this Agreement and Borrower's Loan are hereby incorporated into and made a part of this Agreement. This Agreement is the entire agreement of the parties with respect to the subject matter hereof and supersedes any prior written or verbal communications or instruments relating thereto.

SECTION 46.    COUNTERPARTS; ELECTRONIC OR FAX SIGNATURES. This Agreement may be executed in one or more counterparts, each of which counterparts shall be deemed to be an original, and all such counterparts shall constitute one and the same instrument. For purposes of the execution of this Agreement, facsimile signatures delivered by electronic or fax submission shall be treated in all respects as original signatures.

SECTION 47.    CUSTOMER SERVICE CONTACT INFORMATION. If you have questions or comments about your Loan, you may contact us by (i) e-mail at **customerservice@mulliganfunding.com**, (ii) telephone at **844-437-3863**.

SECTION 48.    PERSONAL GUARANTY. The undersigned (each a "Guarantor"), jointly and severally (if more than one), absolutely and unconditionally guarantee the prompt payment to Lender, including its successors and assignees, of any and all Obligations incurred by the Borrower pursuant to the Agreement (this "Personal Guaranty"). Each Guarantor further agrees to repay the Obligations on demand, without requiring Lender first to enforce payment against Borrower, or against any other Guarantor, if applicable. This is a guarantee of payment and not of collection. This is an absolute, unconditional, primary, and continuing obligation and will remain in full force and effect until the first to occur of the following: (a) all of the Obligations have been indefeasibly paid in full, and Lender has terminated this Personal Guaranty, or (b) 30 days after the date on which written notice of revocation is actually received and accepted by Lender. No revocation will affect: (i) the then existing liabilities of the revoking Guarantor under this Personal Guaranty; (ii) Obligations created, contracted, assumed, acquired or incurred prior to the effective date of such revocation; (iii) Obligations created, contracted, assumed, acquired or incurred after the effective date of such revocation pursuant to any agreement entered into or commitment obtained prior to the effective date of such revocation; or (iv) any Obligations then or thereafter arising under the agreements or instruments then in effect and then evidencing the Obligations. Each Guarantor represents and warrants that it is a legal resident of the United States of America. Each Guarantor waives all notices to which the Guarantor might otherwise be entitled by law, and also waives all defenses, legal or equitable, otherwise available to the Guarantor. This Personal Guaranty shall be construed in accordance with the laws of the State of Utah, and shall inure to the benefit of Lender, its successors

DocuSign Envelope ID: A587C5A5-7FC8-4D86-A5F4-33D3D86A8659



and assigns. To the extent not prohibited by applicable law, each of the undersigned Guarantors affirmatively agree to be subject to Section 33, and Section 43 of this Agreement ("Consent to Jurisdiction and Venue", "Arbitration/Class Action Waiver", and "Jury Trial Waiver" respectively).

**SECTION 49.** **CERTIFICATION AND SIGNATURES.** By signing above and/or below or authorizing the person signing below to sign on its behalf, Borrower certifies that Borrower has received a copy of this Agreement; the accompanying Business Loan and Security Agreement Supplement; and the Authorization Agreement for Direct Deposit (ACH Credit) and Direct Payments (ACH Debits), and that Borrower has read, understood and agreed to be bound by their terms. Each person signing below certifies that each person is signing on behalf of the Borrower in the capacity indicated below the signer's name and that such signer is authorized to execute this Agreement on behalf of or the in stated relation to Borrower.

Use of Proceeds Certification

As referred to in Section, by signing below, the Borrower certifies, acknowledges and understands that the proceeds from the requested Loan will be used solely for commercial and business purposes; and that the proceeds will not be used for personal, family or household purposes.

[Signature page follows]

---

### NOTICE TO GUARANTOR

**You are being asked to guarantee the past, present, and future Obligations of Borrower. If Borrower does not pay, you will have to. You may also have to pay collection costs. Lender can collect the Obligations from you without first trying to collect from Borrower or another Guarantor or proceeding against any other Collateral or other security for the Obligations.**

---

15



Guarantor #1: _Christopher Broussard_    Borrower #1: _Christopher Broussard_
(Signature)                                              (Signature)

**Christopher  Broussard**                        **Apex Services Group LLC dba - Apex Services Group**

Date: 6/25/2021                                    Title:    Managing Partner

                                                   Date:    6/25/2021

Guarantor #2: _____
(Signature)

_____

Date: _____

_____

Guarantor #3: _____
(Signature)

_____

Date: _____

_____

Note: This Signature Page must be signed and dated
before a loan can be funded.

16



## CERTIFICATION OF BENEFICIAL OWNER(S)

Please verify the following information for

1. Any individual(s), who, directly or indirectly, through any contract, arrangement, understanding, relationship, or otherwise **owns 25% or more** of the equity interests of the legal entity also listed below; **AND**
2. An individual with significant responsibility for managing or directing the business (e.g., CEO, President COO, Managing Member, etc)

If any of the information provided is inaccurate or incomplete, please contact Mulligan Funding at docs@mulliganfunding.com or 844-437-3863 to update.

For more information on Beneficial Ownership Certification, visit the following page: https://www.mulliganfunding.com/beneficial-ownership/

I, **Christopher Broussard**, am opening a loan account with Mulligan Funding on behalf of the legal entity listed below:

### LEGAL ENTITY

| Name of Legal Entity | | Corporate Structure | |
|---|---|---|---|
| **Apex Services Group LLC** | | **Limited Liability Company (LLC)** | |
| Address | City | State | Zip |
| 17601 Interstate 35 Access Road | Lytle | TX | 78052 |

### BENEFICIAL OWNER(S)

| Last Name | First Name | M.I. | Date of Birth |
|---|---|---|---|
| **Broussard** | **Christopher** | | |
| Address | City | State | Zip |
| 17601 Interstate 35 Access Road | Lytle | TX | 78052 |
| Country | | SSN (U.S. Persons) | |

DocuSign Envelope ID: A587C5A5-7FC8-4D86-A5F4-33D3D86A8659



| United States | ***-**-3812 |
|---|---|
| For Non-U.S. persons (SSN, Passport Number or other similar identification number)* | Country of issuance: |
|  |  |

## INDIVIDUAL RESPONSIBLE FOR MANAGING OR DIRECTING THE BUSINESS

| Last Name | First Name | M.I. | Date of Birth |
|---|---|---|---|
| Broussard | Christopher |  |  |
| **Address** | **City** | **State** | **Zip** |
| 17601 Interstate 35 Access Road | Lytle | TX | 78052 |
| **Country** |  | **SSN (U.S. Persons)** | |
| United States |  |  | |
| For Non-U.S. persons (SSN, Passport Number or other similar identification number)* | | Country of issuance: | |
|  |  |  | |

*Note: In lieu of a passport number, Non-U.S. Persons may also provide a Social Security Number, an alien identification card number, or number and country of issuance of any other government-issued document evidencing nationality or residence and bearing a photograph or similar safeguard.

I, **Christopher  Broussard**  , hereby certify, to the best of my knowledge, that the information provided above is complete and correct and that I will promptly notify Mulligan Funding of any changes to this information.

**Mulligan Funding**

Signature: Christopher Broussard

Date: 6/25/2021